Maria–Kelley F. YNIGUEZ; Jaime P. Gutierrez, Plaintiffs–Appellees,

and

Arizonans Against Constitutional Tampering, Intervenors–Plaintiffs–Appellees,

and

State of Arizona; Rose Mofford; Robert Corbin, et al., Defendants–Appellees,

v.

ARIZONANS FOR OFFICIAL ENGLISH; Robert D. Parks, Intervenors–Defendants–Appellants.

Maria–Kelley F. YNIGUEZ, Plaintiff–Appellant,

v.

STATE OF ARIZONA; Rose Mofford; Robert Corbin, et al., Defendants–Appellees,

and

Arizonans for Official English; Robert D. Parks, Intervenors–Defendants–Appellants.

Maria–Kelley F. YNIGUEZ, Plaintiff–Appellee,

v.

STATE OF ARIZONA; Rose Mofford; Robert Corbin, et al., Defendants–Appellants.

Nos. 92–17087, 93–15061, 93–15719.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 3, 1994.

Decided Dec. 7, 1994.

As Amended Jan. 17, 1995.

Robert J. Pohlman (Catherine Bergin Yalung on the brief), Ryley, Carlock & Applewhite, Phoenix, AZ, for plaintiff-appellee-cross-appellant.

Stephen G. Montoya (George Vice III on the brief), Bryan Cave, Phoenix, AZ, for intervenors-plaintiffs-appellees.

Grant Woods, Arizona Atty. Gen. (Rebecca White Berch, Arizona Sol. Gen. on the brief), Phoenix, AZ, for defendants-appellees.

Barnaby W. Zall, Williams & Jensen, Washington, DC (James F. Henderson, Scult, Lazarus, French, et al., Phoenix, AZ on the brief), for intervenors-defendants-appellants.

Before: TANG, FLETCHER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

These consolidated appeals require us to consider an important area of constitutional law, rarely reexamined since a series of cases in the 1920s in which the Supreme Court struck down laws restricting the use of non-English languages. *See Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Bartels v. Iowa,* 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923); *Yu Cong Eng v. Trinidad,* 271 U.S. 500, 46 S.Ct. 619, 70 L.Ed. 1059 (1926); *Farrington v. Tokushige,* 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646 (1927). Here, once again, the state has chosen to use its regulatory powers to try to require the exclusive use of the English language.

Specifically at issue in this case is the constitutionality of Article XXVIII of the Arizona Constitution. Article XXVIII provides, *inter alia,* that English is the official language of the state of Arizona, and that the state and its political subdivisions—including all government officials and employees performing government business—must "act" only in English. Arizonans for Official English and its spokesman Robert D. Parks[1] appeal the district court's declaratory judgment that Article XXVIII is facially overbroad in violation of the First Amendment. Maria–Kelley Yniguez, a former Arizona state employee who brought the present action, appeals the district court's denial of nominal damages.

This case raises troubling questions regarding the constitutional status of language rights and, conversely, the state's power to restrict such rights. There are valid concerns on both sides. In our diverse and

1. All further references to Arizonans for Official English also include by implication Parks.

pluralistic society, the importance of establishing common bonds and a common language between citizens is clear. *See Guadalupe Organization, Inc. v. Tempe Elementary School Dist.*, 587 F.2d 1022, 1027 (9th Cir.1978). Equally important, however, is the American tradition of tolerance, a tradition that recognizes a critical difference between encouraging the use of English and repressing the use of other languages. In deciding this case, therefore, we are guided by what the Supreme Court wrote in *Meyer*:

> The protection of the Constitution extends to all, to those who speak other languages as well as those born with English on the tongue. Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced by methods which conflict with the Constitution—a desirable end cannot be promoted by prohibited means.

262 U.S. at 401, 43 S.Ct. at 627.

We conclude that Article XXVIII constitutes a prohibited means of promoting the English language and affirm the district court's ruling that it violates the First Amendment. We also hold that Yniguez is entitled to nominal damages.[2]

## I.

### Factual Background

In October 1987, Arizonans for Official English initiated a petition drive to amend Arizona's constitution to prohibit the government's use of languages other than English. The drive culminated in the 1988 passage by ballot initiative of Article XXVIII of the Arizona Constitution, entitled "English as the

Official Language." The measure passed by a margin of one percentage point, drawing the affirmative votes of 50.5% of Arizonans casting ballots in the election. Under Article XXVIII, English is "the official language of the State of Arizona": "the language of . . . all government functions and actions." §§ 1(1) & 1(2) (see appendix). The provision declares that the "State and all [of its] political subdivisions"—defined as including "all government officials and employees during the performance of government business"— "shall act in English and no other language." §§ 1(3)(a)(iv) & 3(1)(a).

At the time of the passage of the article, Yniguez, a Latina, was employed by the Arizona Department of Administration, where she handled medical malpractice claims asserted against the state. She was bilingual—fluent and literate in both Spanish and English.[3] Prior to the article's passage, Yniguez communicated in Spanish with monolingual Spanish-speaking claimants, and in a combination of English and Spanish with bilingual claimants.

State employees who fail to obey the Arizona Constitution are subject to employment sanctions. For this reason, immediately upon passage of Article XXVIII, Yniguez ceased speaking Spanish on the job. She feared that because of Article XXVIII her use of Spanish made her vulnerable to discipline.

In November 1988, Yniguez filed an action against the State of Arizona, Governor Rose Mofford, Arizona Attorney General Robert Corbin, and Director of the Arizona Department of Administration Catherine Eden, in federal district court.[4] She sought an injunc-

---

**2.** Given our affirmance on the merits, we need not rule upon the state defendants' claim that, in the event of a reversal, the plaintiff's attorney's fees award should be vacated.

**3.** It should be noted that the bulk of the underlying facts in this case were stipulated to by Yniguez and the state defendants. Arizonans for Official English, however, makes certain factual allegations in its briefs on appeal that are unsupported or even contradicted by the record. *Compare* Opening Brief at 24 (Yniguez's use of Spanish "would interfere with the government's substantial interest in the efficiency of its workforce") *with* Stipulated Facts at 5 (Yniguez's use

of Spanish "contributes to the efficient operation of the State"). Nonetheless, the organization made no effort to supplement the record on appeal or to seek a remand. Rather, it explicitly states in its brief that there are no material facts in dispute. At any rate, the facts stipulated to by Yniguez and the state defendants are in the main self-evident. Accordingly, our legal conclusions are based on the record as stipulated to by the original parties.

**4.** Yniguez's original complaint, filed November 10, 1988, named only the State of Arizona as a defendant. She later filed an amended complaint including the other defendants.

tion against state enforcement of Article XXVIII and a declaration that the provision violated the First and Fourteenth Amendments of the Constitution, as well as federal civil rights laws.

Yniguez's complaint was subsequently amended to include Jaime Gutierrez, a Hispanic state senator from Arizona, as a plaintiff. Gutierrez stated that, prior to the passage of Article XXVIII, he spoke Spanish when communicating with his Spanish-speaking constituents and that he continued to do so even after the article's passage. He claimed, however, that he feared that in doing so he was liable to be sued pursuant to Article XXVIII's enforcement provision.

The state defendants all moved for dismissal, asserting various jurisdictional bars to the action. While these motions were pending, the plaintiffs conducted discovery and compiled the defendants' admissions to interrogatories into a Statement of Stipulated Facts, filed with the district court in February 1989. Also filed with the court was the Arizona Attorney General's opinion regarding the interpretation of Article XXVIII, which explained that, "to avoid possible conflicts with the federal ... constitution[ ]," the Attorney General had concluded that the Article only covered the "official acts" of the Arizona government. Finally, the court heard testimony from Yniguez, Senator Gutierrez, and Jane Hill, a linguistic anthropologist, about the adverse impact of Article XXVIII on their speech rights, and the speech rights of the Hispanic population of Arizona.

The district court issued its judgment and opinion on February 6, 1990. *Yniguez v. Mofford,* 730 F.Supp. 309 (D.Ariz.1990). First, the district court resolved the defendants' jurisdictional objections. The court reiterated a previous ruling that the Eleventh Amendment protects the State of Arizona from suit, and then ruled that Gutierrez's claims were barred as to all of the defendants. *Id.* at 311. It reasoned that because state executive branch officials lack authority to prosecute members of the legislative branch, none of the defendants had enforcement power against Gutierrez sufficient to satisfy the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In addition, the court held that *Ex parte Young* barred Yniguez's claim against the Attorney General because he had no specific authority to enforce Article XXVIII. Although the court found that Director Eden had authority to enforce Article XXVIII against Yniguez, it nonetheless held that, because Eden had not threatened to do so, she too should be dismissed as a defendant. The court did find, however, that Governor Mofford both had the authority to enforce Article XXVIII against Yniguez, and had sufficiently threatened to do so for Yniguez to maintain an action against her in accordance with *Ex parte Young.*[5]

The district court then reached the merits of Yniguez's claim. 730 F.Supp. at 313. It read Article XXVIII as barring state officers and employees from using any language other than English in performing their official duties, except to the extent that certain limited exceptions described in the provision applied. Finding that Article XXVIII, thus construed, infringed on constitutionally protected speech, the district court ruled that the provision was facially overbroad in violation of the First Amendment.[6] While granting declaratory relief, the court denied injunctive relief because no enforcement action was pending. Notwithstanding the district court's holding that a provision of the Arizona Constitution was unconstitutional under the United States Constitution, Governor Mofford—an outspoken critic of Article XXVIII—decided not to appeal the judgment. Senator Gutierrez, being satisfied with the constitutional determination, did not appeal the ruling that his claim was barred by *Ex parte Young.*

---

5. In particular, the court relied on the fact that "Mofford has officially stated that she intends to comply with Article XXVIII and expects state service employees, of which Yniguez is one, to comply with Article XXVIII." *Yniguez,* 730 F.Supp. at 312.

6. Because the district court found that Article XXVIII violated the First Amendment, it did not reach the other constitutional and statutory grounds that Yniguez asserted for invalidating the provision.

**1223**

In response to the state's decision not to appeal, Arizonans for Official English moved to intervene postjudgment pursuant to Fed. R.Civ.P. 24(a), for the purpose of pursuing an appeal of the district court's order. Immediately thereafter, the Arizona Attorney General sought to intervene pursuant to 28 U.S.C. § 2403(b) for the same purpose. The Attorney General also asked that the district court amend the judgment because it did not contain a ruling on the defendants' prior motion to certify to state court the question of Article XXVIII's proper interpretation. The district court denied all three motions. *See Yniguez v. Mofford*, 130 F.R.D. 410 (D.Ariz.1990) (holding, *inter alia*, that denial of certification was implicit in previous judgment, and that certification was inappropriate because Article XXVIII is not susceptible of a narrowing construction).

On July 19, 1991, we reversed the district court's denial of the intervention motion of Arizonans for Official English. *Yniguez v. Arizona*, 939 F.2d 727, 740 (9th Cir.1991) ("*Yniguez I*"). We ruled that because the organization was the principal sponsor of the ballot initiative codified as Article XXVIII, its relationship to the provision was analogous to the relationship of a state legislature to a state statute. Specifically, we found that, as the initiative's sponsor, the group had "a strong interest in the vitality of a provision of the state constitution which [it had] proposed and for which [it had] vigorously campaigned." *Id.* at 733. Consequently, we held that Arizonans for Official English satisfied both the requirements of Rule 24(a) and the standing requirements of Arti-

cle III, and could thus intervene for purposes of appeal. *Id.* at 740. In the same opinion, we affirmed the district court's denial of the Attorney General's motion to intervene insofar as he sought to be reinstated as a party to the appeal, but permitted his intervention pursuant to 28 U.S.C. § 2403(b) for the limited purpose of arguing the constitutionality of Article XXVIII. *Id.*

After we issued our opinion regarding intervention, the state filed a suggestion of mootness based on Yniguez's resignation from the Arizona Department of Administration in April 1990. In our second opinion in this case, *Yniguez v. Arizona*, 975 F.2d 646, 647 (9th Cir.1992) ("*Yniguez II*"), we rejected the state's mootness suggestion, reasoning that Yniguez had the right to appeal the district court's failure to award her nominal damages. *Id.* On December 15, 1992, after Arizonans for Official English filed its notice of appeal in the district court, Yniguez filed her notice of cross-appeal requesting nominal damages.[7]

The district court subsequently granted Yniguez's motion for an award of attorney's fees, and the state defendants conditionally appealed that ruling. Their appeal was consolidated with the original appeal on the merits filed by Arizonans for Official English and Yniguez's cross-appeal for nominal damages. All three appeals are now before us, although we do not reach the one relating to attorney's fees. *See* note 2, *supra*. To round out the procedural framework, we note that in 1994 we granted the motion of Arizonans Against Constitutional Tampering and its chairman

---

7. Asking this court to revisit issues already decided in *Yniguez II*, the cross-appellee state defendants assert that Yniguez's request for nominal damages is untimely because such damages were not specifically requested at trial, and their denial was not specifically appealed at that time. However, as we held in *Yniguez II*, Yniguez's blanket request for "all other relief that the Court deems just and proper under the circumstances," encompasses a request for nominal damages. 975 F.2d at 647. In addition, as to her appeal of the district court's denial of such damages, Yniguez has precisely followed the steps we described in that opinion. *See id.* at 647 & n. 2 (stating that Yniguez "may raise the issue of nominal damages in a future cross-appeal").

Similarly, Yniguez suggests that the appeal of Arizonans for Official English is untimely be-

cause its notice of appeal was not filed within thirty days of the date that our order permitting intervention was entered on the district court's docket. However, we retained jurisdiction over the case during that period in reviewing the suggestion of mootness filed by the state. We did not relinquish jurisdiction until after September 16, 1992, when we filed our opinion rejecting the mootness suggestion. In that opinion, we specifically explained that "[t]he district court may now proceed to allow the parties to perfect their appeals and to conduct further proceedings in conformity with our dispositions." *Yniguez II*, 975 F.2d at 648. Although for some reason no mandate issued thereafter, the district court received the case back on November 5, 1992, and Arizonans for Official English timely filed its notice of appeal within thirty days of that date.

Thomas Espinosa[8] to intervene as plaintiffs-appellees in the case. Arizonans Against Constitutional Tampering was the principal opponent of the ballot initiative that became Article XXVIII, had campaigned against it, and, like Arizonans for Official English, had submitted an argument regarding the initiative's merits which appeared in the official Arizona Publicity Pamphlet. *Cf. Yniguez I,* 939 F.2d at 733 (noting that sponsors of a ballot initiative have a strong interest in defending provision they campaigned for, so that there is a "virtual *per se* rule" that they may intervene in litigation involving it). However, in reaching our decision, which provides all the relief that Arizonans Against Constitutional Tampering seeks, we do not rely on that group's standing as a party. Yniguez's standing and that of the other parties and intervenors is sufficient to support the determination that we make here.

## II.

### *The Proper Construction of Article XXVIII*

#### A.

##### *The District Court's Construction*

■ Although eighteen states have adopted "official-English" laws,[9] Arizona's Article XXVIII is "by far the most restrictively worded official-English law to date." Note, *English Only Laws and Direct Legislation: The Battle in the States Over Language Minority Rights,* 7 J.L. & Pol. 325, 337 (1991).[10] Besides declaring English "the official language of the State of Arizona," Article XXVIII states that English is "the

---

8. All further references to Arizonans Against Constitutional Tampering include by implication Espinosa.

9. The federal government of the United States has never recognized English as the "official language," either under the Constitution or federal law. *See generally* Perea, *Demography and Distrust: An Essay on American Languages, Cultural Pluralism and Official English,* 77 Minn. L.Rev. 269, 271–81 (1992) (noting that Continental Congress issued official publications in German and French, as well as English, and that the Framers purposely gave no special designation to English). As one academic commentator has explained, "early political leaders recognized the close connection between language and religious/cultural freedoms, and they preferred to refrain from proposing legislation which might be construed as a restriction on these freedoms." Heath, *Language and Politics in the United States,* in Linguistics and Anthropology 267, 270 (1977). Recent efforts to establish English as the official national language have not succeeded. *See* H.R.J.Res. 81, 101st Cong., 1st Sess. (1989); S.J.Res. 13, 100th Cong., 1st Sess. (1987); *see also* Comment, *The Proposed English Language Amendment: Shield or Sword?,* 3 Yale L. & Pol'y Rev. 519 (1985); *Harris v. Rivera Cruz,* 710 F.Supp. 29, 31 (D.P.R.1989) (stating that "[i]n the United States, there is no official language, and if prudence and wisdom (and possibly the Constitution) prevail, there never shall be"). *But cf. Soberal–Perez v. Heckler,* 717 F.2d 36, 42 (2d Cir.1983) (asserting that "English is the national language of the United States"), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984); *DaLomba v. Director,* 369 Mass. 92, 337 N.E.2d 687, 689 (1975) (stating that "English is the official language of this country").

10. Besides Arizona, the states that have adopted such provisions are: Alabama, Ala. Const. amend. 509; Arkansas, Ark.Code Ann. § 1–4–117; California, Cal. Const. art. III § 6; Colorado, Colo. Const. Art. II § 30a; Florida, Fla. Const. art. II § 9; Georgia, Ga.L.1986, p. 529; Hawaii, Haw. Const. art. XV § 4; Illinois, Ill. Code 5 § 460/20; Indiana, Ind.Code Ann. § 1–2–10–1; Kentucky, Ky.Rev.Stat.Ann. § 2.013; Mississippi, Miss.Code Ann. § 3–3–31; Nebraska, Neb. Const. art. 1 § 27; North Carolina, N.C.Gen.Stat. § 145–12; North Dakota, N.D.Cent.Code § 54–02–13; South Carolina, S.C.Code Ann. § 1–1–696; Tennessee, Tenn.Code Ann. § 4–1–404; and Virginia, Va.Code Ann. § 22.1–212.1. *Compare Meyer,* 262 U.S. at 395, 43 S.Ct. at 625 (stating that "twenty-one States besides Nebraska have enacted similar foreign language laws") (argument of defendant).

Two of these states—California and Hawaii—are in our circuit. The "official-English" provisions in these states, like those of other states besides Arizona, appear to be primarily symbolic. *See, e.g., Puerto Rican Org. for Political Action v. Kusper,* 490 F.2d 575, 577 (7th Cir.1973) (noting that official-English law appears with laws naming state bird and state song, and does not restrict use of non-English languages by state and city agencies). Article III, section 6 of the California Constitution merely establishes English as the official language of the state of California; it imposes no prohibition on other languages and does not affect their use in the functioning of state government. Hawaii's provision is unlike California's in that it recognizes both English and Hawaiian as official state languages, but it too appears to have little practical effect. Given the extent to which the California and Hawaii provisions differ from Article XXVIII, our opinion in this case should not be construed as expressing any view regarding their constitutionality.

language of ... all government functions and actions." §§ 1(1), 1(2). The article further specifies that the state and its subdivisions—defined as encompassing "all government officials and employees during the performance of government business"—"shall act in English and no other language." §§ 1(3)(a)(iv), 3(1)(a). Its broad coverage is punctuated by several exceptions permitting, for example, the use of non-English languages as required by federal law, § 3(2)(a), and in order to protect the rights of criminal defendants and victims of crime, § 3(2)(e).

The district court, interpreting what it found to be the "sweeping language" of Article XXVIII, determined that the provision prohibits:

> the use of any language other than English by all officers and employees of all political subdivisions in Arizona while performing their official duties, save to the extent that they may be allowed to use a foreign language by the limited exceptions contained in § 3(2) of Article XXVIII.

*Yniguez,* 730 F.Supp. at 314.

For reasons we explain below, we agree with the district court's construction of the article.

### B.

### *The Attorney General's Construction*

The Arizona Attorney General proffers a highly limited reading of Article XXVIII under which it applies only to "official acts" of state governmental entities.[11] According to this construction of the provision, which the Attorney General has memorialized in a written opinion, the provision "does not mean

that languages other than English cannot be used when reasonable to facilitate the day-to-day operation of government." Op.Atty.Gen. Az. No. I89–009 (1989).

■ The Supreme Court has, in the past, looked to the narrowing construction given a provision by the State's Attorney General as a guide to evaluating the provision's scope. *Broadrick v. Oklahoma,* 413 U.S. 601, 618, 93 S.Ct. 2908, 2919, 37 L.Ed.2d 830 (1973). For two reasons, however, we do not adopt the Attorney General's construction of Article XXVIII in this case. First, the Attorney General's opinion is not binding on the Arizona courts, *Marston's Inc. v. Roman Catholic Church of Phoenix,* 132 Ariz. 90, 644 P.2d 244, 248 (1982), and is therefore not binding on this court. *Compare Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 395, 108 S.Ct. 636, 644, 98 L.Ed.2d 782 (1988) (refusing to accept as authoritative a non-binding attorney general opinion), *with Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988) (accepting city's binding narrow interpretation). Second, we cannot adopt the Attorney General's limiting construction because it is completely at odds with Article XXVIII's plain language. The Supreme Court has made clear that a limiting construction will not be accepted unless the provision to be construed is "readily susceptible" to it. *American Booksellers Ass'n,* 484 U.S. at 397, 108 S.Ct. at 645. Here, Article XXVIII's clear terms are simply not "readily susceptible" to the constraints that the Attorney General attempts to place on them.

---

11. At oral argument, Arizonans for Official English partially endorsed the Attorney General's reading of Article XXVIII. While purporting to agree with the Attorney General that the provision's mandate that the state and its subdivisions "shall act in English" covered only official governmental acts, the organization nonetheless suggested vaguely that its interpretation of the provision was broader than that of the Attorney General, and that it might, for example, construe the provision as prohibiting state employees from speaking another language in the performance of their duties when unnecessary to do so.

The organization's briefs on appeal were even less clear in indicating its position regarding Article XXVIII's proper scope. The briefs were,

first of all, quite reticent on the question. However, the arguments asserted in support of the provision were quite sweeping, and seemed most appropriate to an extremely broad prohibition on the use of non-English languages by government officials and employees. Although we would, even absent these briefs, be entirely unconvinced by the proffered limiting construction (see below), we find "[t]hat construction even less plausible in light of the broad purposes that [the appellants] insist[ ] underlie the [provision]." *Lind v. Grimmer,* 30 F.3d 1115, 1123 n. 8 (9th Cir.1994) (citing *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 217, 95 S.Ct. 2268, 2277, 45 L.Ed.2d 125 (1975)).

The Attorney General's reading of Article XXVIII focuses on § 3(1)(a), which provides, with limited exceptions, that the "State and all political subdivisions of this State shall *act* in English and in no other language." § 3(1)(a). The Attorney General takes the word "act" from § 3(1)(a) and engrafts onto it the word "official," found in the Article's proclamation of English as the official language of Arizona. In thus urging that the Article only applies to the "official acts" of the state, he also relies on a limited meaning of the noun "act," defined as a "decision or determination of a sovereign, a legislative council, or a court of justice." Op.Atty.Gen. Az. No. I89–009, at 21 (quoting *Webster's International Dictionary* 20 (3d ed., unabridged, 1976) (third sense of "act")). In doing so, however, he ignores the fact that "act," when used as a verb as in Article XXVIII, does not include among its meanings this limited one.[12] Moreover, even were such a meaning somehow plausible if the two phrases were examined out of context, it is contradicted by the remainder of the provision.

Section 1(3)(a)(iv) broadly declares that the rule that Arizona "act in English and in no other language" applies to *all government officials and employees during the performance of government business.* This prohibition on the use of foreign languages when conducting government business supplements the Article's listing of "statutes, ordinances, rules, orders, programs and policies," an enumeration of presumably official acts on which the Attorney General relies heavily. § 1(3)(iii). Thus, not only is the Attorney General's narrow reading of Article XXVIII contradicted by the provision's expansive language, his reading would render a sizeable portion of the Article superfluous, "violating the settled rule that a [provision] must, if possible, be construed in such fashion that every *word* has some operative effect." *United States v. Nordic Village, Inc.,* 503 U.S. 30, ——, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992) (emphasis added); *Mack-*

*ey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 837 & n. 11, 108 S.Ct. 2182, 2189 & n. 11, 100 L.Ed.2d 836 (1988). Here, of course, it is not simply certain words that would, under the Attorney General's reading, become redundant; instead, entire subsections of the provisions would be rendered unnecessary and repetitive.

Indeed, the district court's broader construction of Article XXVIII is the only way to give effect to any of the exceptions contained in § 3(2). If, for example, public teachers in the regular course of their teaching duties would not otherwise be covered by the provision, then there would be no reason to include specific exceptions for *some* of their duties. *See* § 3(2)(a) & (c). Moreover, the provision's clear and specific exclusion of some of the functions of public teachers indicates that the measure on its face applies to other "government employees" performing other types of governmental duties that are not specifically excluded—employees such as clerks at the Department of Motor Vehicles or receptionists at state welfare offices, and other state employees who deliver services to the public. Public teachers' duties do not constitute "official acts" of the state any more or any less than do the duties of these other categories of employees.

Certainly, there is no justification in the text of Article XXVIII for the Attorney General's ingenious suggestion that languages other than English may be used whenever such use would reasonably "facilitate the day-to-day operation of government"—that, in other words, the provision's plain and unequivocal prohibition on the use of other languages may be ignored if it is expedient to do so. To read such a broad and general exception into Article XXVIII would run directly contrary to its structure, scope, and purpose, and would effectively nullify the bulk of its coverage. Article XXVIII plainly does not set forth an innocuous, pragmatic rule that tolerates the use of languages other than English whenever beneficial to the pub-

---

**12.** Similarly, Article XXVIII also describes English as the language of "all government functions and actions." § 1(2). Under no sense of either "functions" or "actions" are the two words limited to official acts. *Cf. Powers v. Ohio,*

499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (finding state action in prosecutor's peremptory challenges of prospective jury members).

lic welfare. Its mandate is precisely the opposite. The use of languages other than English is banned except when expressly permitted. Indeed, the narrow exceptions that set forth the limited circumstances under which non-English languages may be spoken directly belie the conveniently flexible approach that the Attorney General has adopted for purposes of attempting to resurrect a facially unconstitutional measure.

## C.

### Abstention and Certification

█ The Attorney General argues, alternatively, that because the Arizona state courts have not had an opportunity to interpret Article XXVIII, we should abstain from deciding this case and certify the question of the proper interpretation of Article XXVIII to the Arizona Supreme Court. *See* Ariz. Rev.Stat.Ann. § 12–1861 (permitting federal courts to certify questions of state law to Arizona Supreme Court).

█ First, we note that a federal court should abstain only in exceptional circumstances, *Lind,* 30 F.3d at 1121 (citing *Houston v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 2512, 96 L.Ed.2d 398 (1987)), and should be especially reluctant to abstain in First Amendment cases, *Ripplinger v. Collins,* 868 F.2d 1043, 1056 (9th Cir.1989). Abstention pending a narrowing construction of a provision by the state courts is inappropriate where the provision is "justifiably attacked on [its] face as abridging free expression." *Id.* at 1048 (citations and quotations omitted). In fact, the Supreme Court has made it clear that whenever federal constitutional rights are at stake "the relevant inquiry is not whether there is a bare, though unlikely possibility that the state courts *might* render adjudication of the federal question unnecessary." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 237, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) (emphasis in original). "Rather," the Court continued, " 'we have frequently emphasized that abstention is not to be ordered unless the statute is of an

uncertain nature, and is obviously susceptible of a limiting construction.' " *Id.* (quoting *Zwickler v. Koota,* 389 U.S. 241, 251 & n. 14, 88 S.Ct. 391, 397 & n. 14, 19 L.Ed.2d 444). It follows that a court may not abstain and certify a question of statutory interpretation if the statute at issue requires "a complete rewrite" in order to pass constitutional scrutiny. *Lind,* 30 F.3d at 1121 (citing *Houston,* 482 U.S. at 470–71, 107 S.Ct. at 2514–15).

To be sure, the Supreme Court in *American Booksellers* did opt to certify the question of the proper interpretation of a statute to the Virginia Supreme Court. 484 U.S. at 386, 108 S.Ct. at 639. However, *American Booksellers* presented the Court with a "unique factual and procedural setting." *Id.* In that case, the plaintiffs had filed a pre-enforcement challenge to a state obscenity statute that the State Attorney General *conceded* would be unconstitutional if construed as the plaintiffs contended it should be. *Id.* at 393 & n. 8, 108 S.Ct. at 643 & n. 8 (quoting state counsel as saying that if the plaintiffs' interpretation of the statute were correct, then the state *"should* lose the case"). Moreover, there were no non-governmental defendants such as Arizonans for Official English in the case, no state court had ever had the opportunity to interpret the pertinent statutory language, and both levels of lower federal courts had made critically flawed assessments of the statute's coverage because they had relied on invalid evidence. *Id.* at 395–97, 108 S.Ct. at 644–45.

The Attorney General here, in contrast, has never conceded that the statute would be unconstitutional if construed as Yniguez asserts it properly should be.[13] Moreover, at least one Arizona state court has had the opportunity to construe Article XXVIII, and has done nothing to narrow it. *See Ruiz v. State,* No. CV 92–19603 (Jan. 24, 1994) (disposing of First Amendment challenge in three paragraphs). Thus, unlike in *Virginia Booksellers,* there are no unique circumstances in this case militating in favor of certification. *See Lind,* 30 F.3d at 1122 n. 7 (declining to certify question of state law

---

13. The Attorney General has only stated that a narrow construction "may ... be necessary to avoid conflict" with the federal constitution, and

his analysis on the point was based on the Equal Protection Clause of the Fourteenth Amendment rather than the First Amendment.

interpretation in the absence of state concession that law would be unconstitutional on the plaintiff's construction). Accordingly, we must proceed to determine the constitutionality of Article XXVIII.

### D.

#### Conclusion

We agree with the district court's construction of Article XXVIII. The article's plain language broadly prohibits all government officials and employees from speaking languages other than English in performing their official duties, save to the extent that the use of non-English languages is permitted pursuant to the provision's narrow exceptions section. We reject both the Attorney General's narrowing construction of the article and his suggestion of abstention and certification. We conclude that were an Arizona court ever to give the broad language of Article XXVIII a limiting construction similar to that proffered by the Attorney General, it would constitute a "remarkable job of plastic surgery upon the face of the [provision]." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 153, 89 S.Ct. 935, 940, 22 L.Ed.2d 162 (1969). Where, as here, a state provision has been challenged on federal constitutional grounds and a state's limiting construction of that provision would directly clash with its plain meaning, we should neither abstain nor certify the question to the state courts. Rather, under such circumstances, it is our duty to adjudicate the constitutional question without delay.

### III.

#### *Article XXVIII and The First Amendment*

##### A.

#### *Overbreadth*

■■■■ After construing Article XXVIII, the district court ruled that it was unconstitutionally overbroad. Under the overbreadth doctrine, an individual whose own speech may constitutionally be prohibited under a given provision is permitted to challenge its facial validity because of the threat that the speech of third parties not before the court will be chilled. *Board of Airport*

*Comm'rs v. Jews for Jesus,* 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987). Moreover, a party may challenge a law as facially overbroad that would be unconstitutional as applied to him so long as it would also chill the speech of absent third parties. *Lind,* 30 F.3d at 1122–23 (finding statute unconstitutionally overbroad as well as unconstitutional as applied to plaintiff). The facial invalidation that overbreadth permits is necessary to protect the First Amendment rights of speakers who may fear to challenge the provision on their own. *See Brockett v. Spokane Arcades,* 472 U.S. 491, 503, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985). However, in order to support a facial overbreadth challenge, there must always be a "realistic danger" that the provision will significantly compromise the speech rights involved. *Board of Airport Comm'rs,* 482 U.S. at 574, 107 S.Ct. at 2572.

■■■■ A provision will not be facially invalidated on overbreadth grounds unless its overbreadth is both real and substantial judged in relation to its plainly legitimate sweep, and the provision is not susceptible to a narrowing construction that would cure its constitutional infirmity. *See Broadrick v. Oklahoma,* 413 U.S. 601, 613, 615, 93 S.Ct. 2908, 2916, 2917, 37 L.Ed.2d 830 (1973); *United States v. Austin,* 902 F.2d 743, 744 (9th Cir.1990), *cert. denied,* 498 U.S. 874, 111 S.Ct. 200, 112 L.Ed.2d 161 (1990). Accordingly, a law will not be facially invalidated simply because it has some conceivably unconstitutional applications. *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). Rather, to support a finding of overbreadth, there must be a substantial number of instances in which the provision will violate the First Amendment. *New York State Club Ass'n v. City of New York,* 487 U.S. 1, 13, 108 S.Ct. 2225, 2234, 101 L.Ed.2d 1 (1988).

Yniguez contends that Article XXVIII unlawfully prevented her from speaking Spanish with the Spanish-speaking claimants that came to her Department of Administration office. Yniguez, however, challenges far more than Article XXVIII's ban on her own

use of Spanish in the performance of her own particular job. She also contends that the speech rights of innumerable employees, officials, and officers in all departments and at all levels of Arizona's state and local governments are chilled by Article XXVIII's expansive reach. For that reason, she challenges Article XXVIII as overbroad on its face and invalid in its entirety.

■ Article XXVIII's ban on the use of languages other than English by persons in government service could hardly be more inclusive. The provision plainly states that it applies to "the legislative, executive, and judicial branches" of both state and local government, and to "all government officials and employees during the performance of government business." §§ 1(3)(a)(i)(ii) & (iv). This broad language means that Article XXVIII on its face applies to speech in a seemingly limitless variety of governmental settings, from ministerial statements by civil servants at the office to teachers speaking in the classroom, from town-hall discussions between constituents and their representatives to the translation of judicial proceedings in the courtroom.[14] Under the article, the Arizona state universities would be barred from issuing diplomas in Latin, and judges performing weddings would be prohibited from saying "Mazel Tov" as part of the official marriage ceremony. Accordingly, it is self-evident that Article XXVIII's sweeping English-only mandate limits the speech of governmental actors serving in a wide range of work-related contexts that differ significantly from that in which Yniguez performed her daily tasks. The speech rights of all of Arizona's state and local employees, officials, and officers are thus adversely affected in a potentially unconstitutional manner by the breadth of Article XXVIII's ban on non-English governmental speech. For these reasons, we cannot say that the provision's "only unconstitutional application is the one directed at a party before the court...." *Lind,* 30 F.3d at 1122. Therefore, Yniguez's challenge to Article XXVIII properly implicates overbreadth analysis and, if unconstitutional, "the entire [provision] may be invalidated to protect First Amendment interests." *Id.*

Facial invalidation is also appropriate here because the broad language employed throughout Article XXVIII relates to a single subject and is based on a single premise, which, as we will discuss subsequently, is constitutionally flawed. In cases such as this, where the provision in question "in all its applications ... operates on a fundamentally mistaken premise," *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 966, 104 S.Ct. 2839, 2852, 81 L.Ed.2d 786 (1984), the Supreme Court "has not limited itself to refining the law by preventing improper applications on a case-by-case basis." *Id.* at 965 n. 13, 104 S.Ct. at 2852 n. 13. Rather, the Court will simply strike down the provision on its face. "[W]here the defect in the [provision] is that the means chosen to accomplish the state's objectives are too imprecise, so that in all its applications the [provision] creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack." *Id.* at 967–68, 104 S.Ct. at 2852–53.

Moreover, the nature and structure of Article XXVIII is such that if we determine it to be unconstitutionally overbroad, then we must invalidate the entire article and not simply some of its sections. Even a cursory reading of Article XXVIII demonstrates that the provision is an integrated whole that seeks to achieve a specific result: to prohibit

---

14. The district court held that the Eleventh Amendment barred State Senator Gutierrez from suing state officials in federal court to challenge Article XXVIII's application to legislators. The district court concluded that these state officials lacked the power to enforce Article XXVIII against him and thus could not be proper federal defendants under *Ex parte Young. See Yniguez,* 730 F.Supp. at 311. This ruling is not before us on appeal and we intimate no opinion as to its merits. However, it is important to note that the court's ruling does not mean that Article XXVI-II's broad reach imposes no chilling effect upon the speech of legislators. Even if it were true that state officials have no authority to punish a legislator who violates Article XXVIII, it remains the case that legislators are required to comply with the state constitution and that harmful consequences may flow from violation of its provisions. Thus, whatever Gutierrez's particular power to bring this suit in federal court, the First Amendment interests of state legislators are properly considered as part of an inquiry into Article XXVIII's overbreadth.

the use in all oral and written communications by persons connected with the government of all words and phrases in any language other than English. There is no fair reading of the article that would permit some of its language to be divorced from this overriding objective.

Equally important, the article contains no severability provision that would suggest that any clause or section was intended to survive if other parts were held unconstitutional, *cf. Brockett,* 472 U.S. at 506, 105 S.Ct. at 2803 (citing a statute's severability clause as an important factor favoring partial rather than facial invalidation), and the parties before the court have never treated Article XXVIII as anything other than a single entity that must stand or fall as a whole. Indeed, appellees have always presented Article XXVIII as an integrated provision that is designed to eliminate all non-English words from governmental speech, although they have pressed for an artificially narrow construction of what constitutes such speech. Thus, if the article's specific restrictions on the use of languages other than English are unconstitutionally overbroad, then the language and structure of the amendment makes facial invalidation of the entire article the only appropriate remedy.

As we noted at the outset of this section, however, Article XXVIII will only be unconstitutionally overbroad if it violates the First Amendment in a substantial number of instances. *New York State Club Ass'n,* 487 U.S. at 13, 108 S.Ct. at 2234. To determine whether Article XXVIII's restrictions unconstitutionally impose on the speech rights of a substantial number of persons in government service in a substantial number of instances, we need only consider the article's impact on Arizona's numerous state and local public employees. In sheer number, these employees represent the most substantial target of Article XXVIII's restrictions on speech in languages other than English as they constitute the most common source of communications between the government and the public that it serves. In addition, a determination that Article XXVIII unconstitutionally infringes on the First Amendment rights of these employees will necessarily result in the conclusion that the article also unlawfully chills the speech of many others who serve in government, such as judges and legislators. The same restrictions that are unconstitutional as to the routine speech often engaged in by civil servants will *a fortiori* be unconstitutional as to the various kinds of speech engaged in by a substantial number of other persons who work in government and are therefore affected by the article's unusually broad reach. *See Yniguez,* 730 F.Supp. at 314; *Cf. Bond v. Floyd,* 385 U.S. 116, 132–33, 87 S.Ct. 339, 347–48, 17 L.Ed.2d 235 (1966) (a state may not impose stricter First Amendment standards on legislators).

Yniguez's challenge to Article XXVIII thus presents us with a clear issue. If we determine that Article XXVIII's impact on the speech rights of public employees is unconstitutional, we will be compelled to invalidate Article XXVIII on its face and in its entirety. Before turning directly to the article's impact on the First Amendment rights of public employees, however, we must first address two preliminary arguments that are raised by the appellants and that could affect our analysis. First, Arizonans for Official English contends that Article XXVIII interferes only with expressive conduct and not pure speech. Second, the group contends that the state may not be compelled to provide information to all members of the public in a language that they can comprehend. For the reasons that we explain below, the two arguments do not affect the ultimate conclusions that we reach.

## B.

### *Speech v. Expressive Conduct*

 Arizonans for Official English argues vehemently that First Amendment scrutiny should be relaxed in this case because the decision to speak a non-English language does not implicate pure speech rights. Rather, the group suggests, "choice of language ... is a mode of conduct"—a *"nonverbal* expressive activity." Opening Brief at 15, 18 (emphasis added) (quoting *R.A.V. v. City of St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2544, 120 L.Ed.2d 305 (1992)). Accordingly, it compares this case to those involving only "expressive conduct"

or "symbolic speech." *E.g., Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (burning American flag for expressive reasons); *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing arm band for expressive reasons); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (burning draft card for expressive reasons). In such cases, the government generally has a wider latitude in regulating the conduct involved, but only when the regulation is not directed at the communicative nature of that conduct. *Johnson,* 491 U.S. at 406, 109 S.Ct. at 2540.

We find the analysis employed in the above cases to be inapplicable here, as we are entirely unpersuaded by the comparison between speaking languages other than English and burning flags.[15] Of course, speech in any language consists of the "expressive conduct" of vibrating one's vocal chords, moving one's mouth and thereby making sounds, or of putting pen to paper, or hand to keyboard. Yet the fact that such "conduct" is shaped by a language—that is, a sophisticated and complex system of understood meanings—is what makes it speech.[16] Language is by definition speech, and the regulation of any language is the regulation of speech.

A bilingual person does, of course, make an expressive choice by choosing to speak one language rather than another.[17] As Yniguez explained, her choice to speak Spanish with other bilingual people can signify "solidarity" or "comfortableness."[18] Nonetheless, this expressive effect does not reduce choice of language to the level of "conduct," as posited by Arizonans for Official English; instead, it exemplifies the variety of ways that one's use of language conveys meaning. For example, even within a given language, the choice of specific words or tone of voice may critically affect the message conveyed. Such variables—language, words, wording, tone of voice—are not expressive conduct, but are simply among the communicative elements of speech. Moreover, the choice to use a given language may often simply be based on a pragmatic desire to convey information to someone so that they may understand it. That is in fact the basis for the choice involved in the constitutional challenge we consider here.

The Supreme Court recognized the First Amendment status of choice of language in somewhat different circumstances when it ratified a speaker's freedom to say "fuck the draft" rather than "I strongly oppose the draft." *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (reversing conviction under California "offensive con-

15. We have no doubt, however, that even under the relatively relaxed test for expressive conduct set out in *U.S. v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), Article XXVIII would be unconstitutional. Under *O'Brien,* "a government regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679. Article XXVIII fails at least the final prong. *See* discussion, *infra* at §§ IIID(4) and IIID(6).

16. The paradoxical attempt to classify choice of language as conduct is useful, perhaps, in underscoring the weakness of the strict conduct/speech distinction. As the example of American sign-language illustrates, we describe various kinds of physical conduct—whether the making of specific sounds or specific hand movements—as language when they have reached a level of sophistication in grammatical structure and vocabulary

to allow them to convey complex ideas with a sufficient degree of accuracy. *See Johnson,* 491 U.S. at 404, 109 S.Ct. at 2539 (in deciding whether particular conduct is protected by the First Amendment, asking "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it' ") (quoting *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974)).

17. It is important to recall, by contrast, that a monolingual person does not have the luxury of making the expressive choice to communicate in one language or another. If that person is to speak at all, it is in a single language which may not be English.

18. Conversely, the deliberate choice to speak to someone in a language that he or she does not understand may convey a strong message of exclusion.

duct" law). Like the proponents of Article XXVIII, the state in *Cohen* had described Cohen's choice of language as conduct equivalent to burning a draft card. *Id.* at 18, 91 S.Ct. at 1784 (citing *O'Brien, supra*); *see also id.* at 27, 91 S.Ct. at 1789 (Blackmun, J., dissenting) (arguing that Cohen's phrasing "was mainly conduct and little speech"). The Court unequivocally rejected the comparison, stating that Cohen's conviction rested "solely upon speech." *Id.* at 18, 91 S.Ct. at 1784.

Warning that the First Amendment does not, however, give people the absolute right to use any form of address in any circumstances, the Court next addressed the question of whether Cohen's conviction could potentially be upheld as a regulation of the manner of Cohen's speech. *Id.* at 19, 91 S.Ct. at 1785. Specifically, it framed the First Amendment issue by asking "whether California can excise ... one particularly scurrilous epithet from the public discourse." *Id.* at 23, 91 S.Ct. at 1787. Its answer to that question was, "No." Indeed, in justifying its conclusion, the Court echoed Yniguez's comments regarding her use of Spanish. It stated that "words are often chosen as much for their emotive as their cognitive force"—to such an extent, in fact, that this emotive aspect "may often be the more important element of the overall message sought to be communicated." *Id.* at 26, 91 S.Ct. at 1788.

Under Article XXVIII, of course, the state is not singling out one word for repression, but rather entire vocabularies. Moreover, the languages of Cervantes, Proust, Tolstoy, and ,Lao–Tze, among others, can hardly be described as "scurrilous." In this case, therefore, the Court's admonishment that "in a society as diverse and populous as ours" the state has "no right to cleanse public debate" of unpopular words, rings even truer. *Id.* at 24–25, 91 S.Ct. at 1787–88. While Arizonans for Official English complains of the "Babel" of many languages, the Court in *Cohen* responds that this "verbal cacophony is ... not a sign of weakness but of strength." *Id.* at 25, 91 S.Ct. at 1788; *see also Alfonso v. Board of Review,* 89 N.J. 41, 444 A.2d 1075, 1085 (Wilentz, C.J. dissenting) (arguing that notice should be given in the language of the claimant and stating that to do so would show that "we are strong enough to give meaning to our fundamental rights when they are possessed by non-English speaking people in our midst"), *cert. denied,* 459 U.S. 806, 103 S.Ct. 30, 74 L.Ed.2d 45 (1982).

In sum, we most emphatically reject the suggestion that the decision to speak in a language other than English does not implicate pure speech concerns, but is instead akin to expressive conduct. Speech in any language is still speech, and the decision to speak in another language is a decision involving speech alone.

### C.

### *Affirmative Versus Negative Rights*

Arizonans for Official English next contends, incorrectly, that Yniguez seeks an affirmative right to have government operations conducted in foreign tongues. Because the organization misconceives Yniguez's argument, it relies on a series of cases in which non-English-speaking plaintiffs have unsuccessfully tried to require the government to provide them with services in their own language. *See Guadalupe Org. Inc.,* 587 F.2d at 1024 (no right to bilingual education); *Carmona v. Sheffield,* 475 F.2d 738 (9th Cir. 1973) (no right to unemployment notices in Spanish); *Toure v. United States,* 24 F.3d 444 (2d Cir.1994) (no right to notice of administrative seizure in French); *Soberal–Perez v. Heckler,* 717 F.2d 36 (2d Cir.1983) (no right to Social Security notices and services in Spanish), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984); *Frontera v. Sindell,* 522 F.2d 1215 (6th Cir. 1975) (no right to civil service exam in Spanish). These cases, however, hold only that (at least under the circumstances there involved) non-English speakers have no affirmative right to compel state government to provide information in a language that they can comprehend. The cases are inapplicable here.

In the case before us, there is no claim of an affirmative right to compel the state to provide multilingual information, but instead only a claim of a negative right: that the

state cannot, consistent with the First Amendment, gag the employees currently providing members of the public with information and thereby effectively preclude large numbers of persons from receiving information that they have previously received. *Cf. Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 866–67, 102 S.Ct. 2799, 2807–08, 73 L.Ed.2d 435 (1982).[19] Such a claim falls squarely within the confines of traditional free speech doctrine, and is in no way dependent on a finding of an affirmative duty on the part of the state.

In addition, the cases relied on by the amendment's sponsor do not consider or discuss the First Amendment. Rather, in all those cases the plaintiffs sought to justify the alleged right to compel the state to provide bilingual information and services by reference to equal protection and due process principles. Because mandating compliance with the plaintiffs' requests would have placed an affirmative burden on state and local agencies to supply a bilingual speaker—creating affirmative costs—the courts rejected the claims. *See, e.g., Frontera*, 522 F.2d at 1219 (emphasizing that the cost of bilingual civil service examinations "would ultimately be saddled upon the harried taxpayers of Cleveland"); *Toure*, 24 F.3d at 446 (requirement of notice in language of plaintiff would "impose a patently unreasonable burden upon the government").

Accordingly, the argument of the amendment's sponsor is irrelevant to the right we consider in this case. For while the state may not be under any obligation to *provide* multilingual services and information, it is an entirely different matter when it deliberately sets out to *prohibit* the languages customari-

ly employed by public employees. In this connection, we note that here, unlike in the affirmative right cases, there is no contention that "harried taxpayers" will be "saddled" with additional costs, or that the state will be subjected to a "patently unreasonable burden." All that the state must do to comply with the Constitution in this case is to refrain from terminating normal and cost-free services for reasons that are invidious, discriminatory, or, at the very least, wholly insufficient.

D.

*Public Employee Speech*

1.

*General Principles*

■■■ If this case involved a statewide ban on all uses of languages other than English within the geographical jurisdiction of the state of Arizona, the constitutional outcome would be clear. A state cannot simply prohibit all persons within its borders from speaking in the tongue of their choice. Such a restriction on private speech obviously could not stand. *Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923). However, Article XXVIII's restraint on speech is of more limited scope. Its ban is restricted to speech by persons performing services for the government. Thus, we must look beyond first principles of First Amendment doctrine and consider the question of what limitations may constitutionally be placed on the speech of government servants.

■■■ For nearly half-a-century, it has been axiomatic in constitutional law that gov-

---

19. The distinction between affirmative and negative rights, though its legitimacy has been much disputed in academic circles, continues to find favor with the Supreme Court. *See, e.g., DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 196–97, 109 S.Ct. 998, 1003–04, 103 L.Ed.2d 249 (1989) (rejecting the view that the Constitution imposes "affirmative obligations" on the state). In some instances, the line separating the affirmative from the negative is hard to draw—even though it may be critical to the outcome of a case. *Compare Union Free School Dist. No. 26*, 457 U.S. at 855–56, 102 S.Ct. at 2802 (asking "whether the First Amendment imposes limitations [upon the school

board's power] to *remove* library books from high school and junior high school libraries") (plurality opinion) (emphasis added), *and id.* at 878, 102 S.Ct. at 2814 (stating that the right at issue does not involve "any *affirmative obligation* to provide students with information or ideas") (Blackmun, J., concurring) (emphasis added), *with id.* at 886, 102 S.Ct. at 2818 (complaining that "the plurality suggests that there is a new First Amendment *'entitlement'* to have access to particular books in a school library") (Burger, C.J., dissenting) (emphasis added). In the present case, however, there can be no doubt that Article XXVIII represents a prohibition on non-English speech, not simply a failure to provide it.

ernment employees do not simply forfeit their First Amendment rights upon entering the public workplace. In 1972, the Supreme Court elaborated on this principle in upholding a constitutional challenge to a state college's refusal to renew the contract of a teacher who had criticized its policies. *See Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). "For at least a quarter century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech.... [M]ost often, we have applied this principle to denials of public employment." *Id.* Only four years ago, the Supreme Court in *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 72, 110 S.Ct. 2729, 2736, 111 L.Ed.2d 52 (1990), reaffirmed this principle and reiterated these same words from *Perry* in upholding a First Amendment challenge to a governmental infringement on public employee rights. Thus, the Supreme Court has made it abundantly clear that prohibitions on speech may not be justified by the simple assertion that the government is the employee's employer.

### 2.

#### *Regulation of Traditional Types of Public Employee Speech*

■ Arizonans for Official English acknowledges that public employee speech is entitled to First Amendment protection. The group then correctly points out that the Supreme Court has held in a series of cases that the government traditionally has a freer hand in regulating the speech of its employees than it does in regulating the speech of private citizens. *See Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994) (plurality opinion); *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ. of Township High School*

*Dist.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). As the Court in *Waters* explained, "even many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees." —— U.S. at ——, 114 S.Ct. at 1886. Notably, the *Waters* Court stated that the *Cohen* rule mandating toleration of choice of language would be inapplicable to the government workplace and made it clear that, in fact, a government employer might appropriately bar its employees from using rude or vulgar language in the workplace. *Id.; see also Martin v. Parrish,* 805 F.2d 583, 584 (5th Cir.1986).

Elaborating on concepts previously expressed in *Pickering* and *Connick,* the *Waters* Court examined the reasons that less stringent scrutiny is ordinarily justified in reviewing restrictions on public employee speech. The Court found, in particular, that "the extra power the government has in this area comes from the nature of the government's mission as employer," *id.,* —— U.S. at ——, 114 S.Ct. at 1887, and it ultimately concluded that:

> [t]he key to First Amendment analysis of government employment decisions ... is this: The government's interest in achieving its goals as *effectively and efficiently* as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of *efficiency.* But where the government is employing someone for the very purpose of *effectively* achieving its goals, such restrictions may well be appropriate.

*Id.* at ——, 114 S.Ct. at 1888 (emphases added); *see also Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734; *Connick,* 461 U.S. at 146–47, 103 S.Ct. at 1689–90; *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899.

Thus, the Court has made it clear that it is the government's interest in performing its functions efficiently and effectively that underlies its right to exercise greater control over the speech of public employees. Even before *Waters,* the Court's concern for effi-

ciency and effectiveness led it to conclude that when a public employee speaks "as an employee upon matters only of personal interest," then, "absent the most unusual circumstances," the challenged speech restriction will be upheld. *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690; *Rankin*, 483 U.S. at 385 n. 13, 107 S.Ct. at 2899 n. 13. Concerned that "government offices could not function if every employment decision became a constitutional matter," the Court ruled that mere "employee grievances," (*Connick*, 461 U.S. at 146, 103 S.Ct. at 1689)—involving speech, for example, about "internal working conditions, affecting only the speaker and co-workers," (*O'Connor v. Steeves*, 994 F.2d 905, 914 (1st Cir.1993))—should rarely be protected by the federal courts.

■■■ The *Waters/Pickering* cases also establish, however, that public employee speech deserves far greater protection when the employee is speaking not simply upon employment matters of personal or internal interest but instead "as a citizen upon matters of public concern". *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. In evaluating restrictions on speech of "public concern," the governmental interest in efficiency and effectiveness is important but not necessarily determinative. In such cases, the content of the speech requires that the government's concern with efficiency and effectiveness be balanced against the public employee's first amendment interest in speaking as emphasized in *Perry* and *Rutan*. *See Waters*, —— U.S. at ——, 114 S.Ct. at 1887; *Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir.1989). As the Court said in *Waters*, "a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations, the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." —— U.S. at ——, 114 S.Ct. at 1887.

### 3.
#### *The Interests Favoring Protection of the Prohibited Speech*

■■■ Here the speech does not fit easily into any of the categories previously established in the case law. It is clear that the speech at issue cannot be dismissed as merely speech involving "employee grievances" or "internal working conditions"—speech that is ordinarily of little concern to the general public. Nor is it precisely the same as the speech generally denominated in past cases as "speech on matters of public concern," in part because here the employee is not simply commenting on a public issue but in speaking is actually performing his official duties.

This case does not, however, require us to attempt to resolve any broad, general questions regarding the scope of government's authority to regulate speech that occurs as part of an employee's official duties. In many instances, the governmental interest in regulation will be at its height in such cases.[20] On the other hand, there are few First Amendment precedents in this area, and in at least one case involving a school teacher, we employed a traditional balancing test. *See, e.g., Nicholson v. Board of Educ.*, 682 F.2d 858, 865 (9th Cir.1982) (applying *Pickering* balancing test to job performance speech). For present purposes, it is enough to note that the fact that the speech occurs as a part of the performance of the employee's job functions affects the nature of our analysis but does not necessarily determine its outcome. The context in which the speech occurs must be weighed along with the other relevant factors when we balance the conflicting interests. Here, the context actually militates in favor of protecting the speech involved.

■■■ In deciding whether to afford constitutional protection to prohibited employee speech, we must consider both the general interest of the public servant in speaking freely, as described in *Perry* and *Rutan*, and

20. For example, the government would have an indisputable right to prohibit its employees from using profanity or abusive language while conducting official business. *See Waters*, —— U.S. at ——, 114 S.Ct. at 1886 (noting that government might prohibit its employees "from being 'rude to customers'") (citation omitted)). Similarly, the government would ordinarily have the authority to determine the tasks that it asks its employees to perform and to dictate the content of the messages that it wishes its employees to communicate to the public.

the importance to the public of the speech involved. *See Connick,* 461 U.S. at 149, 103 S.Ct. at 1691 (considering the public's interest in the speech in determining whether to protect it); *Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736–37 (same). The employee speech banned by Article XXVIII is unquestionably of public import. It pertains to the provision of governmental services and information. Unless that speech is delivered in a form that the intended recipients can comprehend, they are likely to be deprived of much needed data as well as of substantial public and private benefits. The speech at issue is speech that members of the public desire to hear. Indeed, it is most often the recipient, rather than the public employee, who initiates the dialogue in a language other than English. *See Connick,* 461 U.S. at 149, 103 S.Ct. at 1691 (judging whether speech is of "public concern" by assessing whether it would convey information of use to the public); *Piver v. Pender County Bd. of Educ.,* 835 F.2d 1076, 1079–80 (4th Cir.1987) (quoting *Berger v. Battaglia,* 779 F.2d 992, 998–99 (4th Cir.1985) (citations omitted)), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988) (stating that speech is of "public concern" based on whether the public wants to hear it.)

The practical effects of Article XXVIII's *de facto* bar on communications by or with government employees are numerous and varied. For example, monolingual Spanish-speaking residents of Arizona cannot, consistent with the article, communicate effectively with employees of a state or local housing office about a landlord's wrongful retention of a rental deposit, nor can they learn from clerks of the state court about how and where to file small claims court complaints.[21] They cannot obtain information regarding a variety of state and local social services, or adequately inform the service-givers that the governmental employees involved are not performing their duties properly or that the government itself is not operating effectively

or honestly. Those with a limited command of English will face commensurate difficulties in obtaining or providing such information. *Cf. Garcia v. Spun Steak,* 998 F.2d 1480, 1488 (9th Cir.) (effect of English-only employment rule varies from workplace to workplace; in some circumstances it effectively may deny employees with limited proficiency in English the capacity to communicate on the job, and may therefore be invalid as applied to them), *reh'g en banc denied,* 13 F.3d 296 (1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994).

Because Article XXVIII bars or significantly restricts communications by and with government officials and employees, it significantly interferes with the ability of the non-English-speaking populace of Arizona " 'to receive information and ideas.' " *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 757, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (quoting *Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972)). As the Court explained in *Virginia Citizens,* "freedom of speech 'necessarily protects the right to receive.' " *Id.; see also Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853, 866–68, 102 S.Ct. 2799, 2807–09, 73 L.Ed.2d 435 (1982); *Procunier v. Martinez,* 416 U.S. 396, 408–09, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974); *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969); *Lamont v. Postmaster General,* 381 U.S. 301, 307–08, 85 S.Ct. 1493, 1496–97, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (invalidating statute prohibiting teaching of foreign languages in part because it interfered "with the opportunities of pupils to acquire knowledge"). Although *Virginia Citizens* is not controlling here because it involved a restriction on the speech of a private entity that willingly provided infor-

---

**21.** We note that in *Gutierrez v. Municipal Court,* 838 F.2d 1031 (9th Cir.1988), *vacated as moot,* 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989), while striking down an English-only rule applicable to the private speech of Los Angeles Municipal Courts employees on the ground that

it violated Title VII, we explained that serious constitutional questions would arise if such a rule were to forbid communication in Spanish with the non-English-speaking public. *Id.* at 1044 n. 19.

mation to the public,[22] the "right to receive" articulated in *Virginia Citizens* and related cases is clearly relevant in public employee speech cases. Public employee speech doctrine takes into account the public's "right to receive information and ideas" by affording greater protection to speech that the public has an interest in receiving. *See Connick,* 461 U.S. at 149, 103 S.Ct. at 1691; *Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736–37; *Piver,* 835 F.2d at 1079–80.

Article XXVIII obstructs the free flow of information and adversely affects the rights of many private persons by requiring the incomprehensible to replace the intelligible. Under its provisions, bilingual public employees will be aware that in many instances the only speech they may lawfully offer may be of no value. The article effectively requires that these employees remain mute before members of the non-English speaking public who seek their assistance. At such moments of awkward silence between government employees and those they serve, it will be strikingly clear to all concerned that vital speech that individuals desire both to provide and to hear has been stifled by the state.

4.

*The Absence of Any State Interest In Efficiency and Effectiveness*

In light of the interests of both public employees and members of the public in the prohibited speech, a decision as to the constitutionality of Article XXVIII's restrictions involves at a minimum a weighing and balancing process similar to that conducted in the more traditional cases involving public employee speech of "public concern".[23] There is, however, another significant difference between this case and the traditional *Waters/Pickering* line of "public concern" cases that further complicates the issue. The efficiency and effectiveness considerations that constitute the fundamental governmental interest in the usual "public con-

cern" cases—and that provide the justification against which the employee's First Amendment interests must be weighed—are wholly absent here. Indeed, as the parties acknowledged in the stipulation of uncontested facts, Arizona's interest in the efficiency and effectiveness of its workforce runs directly counter to Article XXVIII's restriction on public employee speech. *See* note 3, *supra.*

Specifically, the facts of this case unequivocally establish that Yniguez's use of Spanish in the course of her official duties contributed to the efficient and effective administration of the State. *See* Statement of Stipulated Facts at 5–6. More generally, the facts of this case, as well as elementary reason, tell us that government offices are more efficient and effective when state and local employees are permitted to communicate in languages other than English with consumers of government services who are not proficient in that language. *Id.* (stating that use of non-English languages promotes the "efficient administration of the State"); *Cota v. Tucson Police Dept.,* 783 F.Supp. 458, 462 (D.Ariz. 1992) (emphasizing that "the availability of Spanish-speaking personnel is necessary for effective performance of [the Tucson Police Department's] mission").

Additionally, as we explained earlier, if the purpose of Article XXVIII were to promote efficiency, it would not impose a total ban but would provide that languages other than English may be used in government business only when they facilitate such business and not when they hinder it. Article XXVIII plainly does not make this distinction. *See, supra,* at 1226–27.

On this point, we note that Arizonans for Official English's assertion that government inefficiency and "chaos" will result from Article XXVIII's invalidation is not only directly contrary to the stipulated facts but is predicated upon a wholly erroneous assumption as

---

**22.** In *Virginia Citizens,* the Court struck down a statute declaring it unprofessional conduct for a licensed pharmacist to advertise the prices of prescription drugs, holding that the statute violated the First Amendment. Specifically, it found that the government's suppression of the flow of prescription drug price information violated consumers' right to receive the information. *Id.,* 425 U.S. at 770, 96 S.Ct. at 1829.

**23.** The alternative is, of course, to apply the strict scrutiny test. *See Rutan,* 497 U.S. at 70 & n. 4, 110 S.Ct. at 2735 & n. 4. *See also* discussion *infra* at 1242–1243.

to the nature of Yniguez's claim. The group contends that appellees seek the right to speak another language at will and regardless of whether the intended recipient of the speech primarily speaks that language or is even able to comprehend it. However, such a "right" would be of a far different order than the right at issue here. As the facts show, Yniguez spoke Spanish with Spanish-speaking claimants and English with English-speaking claimants. She does not claim any right to "choose" to speak Spanish with claimants who would not understand her, nor would this or any other court uphold such a right. Accordingly, in the interests of clarity, we emphasize that by ruling that the state cannot unreasonably limit the use of non-English languages, we do not imply that the state is therefore forced to allow inappropriate or burdensome language uses. In short, we do not suggest that a public employee has a "right" to speak in another language when to do so would hinder job performance. *Cf. Jurado v. Eleven–Fifty Corp.*, 813 F.2d 1406 (9th Cir.1987) (Title VII not violated by radio station's firing of announcer who refuses to follow programming format and insists on speaking in Spanish). We merely consider here the lawfulness of speech in languages other than English that *furthers* the state's traditional interest in efficiency and effectiveness.

### 5.

### *The Propriety of Considering State Justifications Other Than Efficiency and Effectiveness*

Because the speech at issue here does not adversely affect the state's interest in efficiency and effectiveness, and because the *Waters/Pickering* line of cases limits consideration of the governmental interest to these concerns, were we to apply the traditional *Waters/Pickering* balancing test, Arizonans for Official English would lose by default. There would be nothing on the non-free speech side of the scale. There have, however, been a number of other cases in which the Court (though sometimes giving *some* weight to efficiency and effectiveness concerns) has considered primarily the government's argument that a broader set of justifications sup-

ports a particular restriction on the First Amendment rights of public employees.

Most of the cases in which the government has relied on justifications other than efficiency and effectiveness have involved patronage practices, although some have involved restrictions on public employees' political activities. *See, e.g., Rutan v. Republican Party of Illinois*, 497 U.S. 62, 70–75 & n. 4, 110 S.Ct. 2729, 2735–37 & n. 4, 111 L.Ed.2d 52 (1990) (citing, *inter alia*, interest in preventing excessive political fragmentation and strengthening party system); *Elrod v. Burns*, 427 U.S. 347, 364–69, 96 S.Ct. 2673, 2685–88, 49 L.Ed.2d 547 (1976) (citing, *inter alia*, interest in preserving the democratic process); *Civil Service Comm'n v. Letter Carriers*, 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973) (citing, *inter alia*, interest in preventing development of a powerful and corrupt political machine). In those cases, the government has relied on the broader concerns that "the government might have in the structure and functioning of society as a whole." *Rutan*, 497 U.S. at 70 n. 4, 110 S.Ct. at 2735 n. 4. In other words, the concerns on which the government has relied do not relate to ensuring an efficient workplace but instead involve more general societal interests. In such cases, there is no substantial nexus between the alleged governmental interest and job performance.

In the most recent Supreme Court case in which the government sought to justify a limitation on public employee First Amendment rights on the basis of broad governmental interests rather than on traditional efficiency and effectiveness concerns, the majority applied a strict scrutiny test and rejected the challenged governmental practices. The majority concluded that because the government's interests in the regulations were not "employment-related," there was no reason to relax the strict scrutiny ordinarily applied to restrictions on speech. *Rutan*, 497 U.S. at 70 n. 4, 110 S.Ct. at 2735 n. 4. By contrast, the dissenters applied a more permissive balancing test, asking: "can the governmental advantages of this employment practice reasonably be deemed to outweigh its 'coercive' effects?" *Compare Rutan*, 497 U.S. at 70–74 & n. 4, 110 S.Ct. at 2735–36 &

n. 4 *with id.* at 96–104 & n. 3, 110 S.Ct. at 2749–52 & n. 3 (Scalia, J., dissenting). The dissenters adopted the premise that broader governmental interests were due no less deference than the governmental interest in efficiency and effectiveness.[24] Accordingly, the dissenters' approach essentially mimicked the *Waters/Pickering* balancing test; it simply broadened the scope of that test to account for interests other than efficiency and effectiveness.

Just as this case differs in some respects from the traditional *Waters/Pickering* cases, it differs from the *Rutan/Elrod* cases. It differs from the former primarily because no state interest in efficiency and effectiveness is present here; it differs from the latter primarily because the speech that is barred by the article is job performance speech. It is not entirely clear whether a balancing test or strict scrutiny is best suited to the consideration of Arizona's prohibition on public employee speech in languages other than English. However, that is a question we need not decide. Whether we apply strict scrutiny as suggested by *Rutan*, or whether we use some form of balancing test similar to that advocated by the *Rutan* dissenters and modelled on the approach traditionally employed in the *Waters/Pickering* line of cases, the result is the same: The restrictions on free speech are not justified by the alleged state interests.

### 6.

*Evaluating the Alleged State Justifications*

Arizonans for Official English claims, as it and others did when the initiative was on the ballot, that Article XXVIII promotes significant state interests. The organization enumerates these interests as: protecting democracy by encouraging "unity and political stability"; encouraging a common language; and protecting public confidence.

We note, initially, that there is no basis in the record to support the proponents' assertion that any of the broad societal interests on which they rely are served by the provisions of Article XXVIII. We also note that the article itself contains no statement of findings that would suggest that it would serve the interests asserted by the appellants. The absence of any evidence to this effect is of particular significance given that the deference normally accorded legislative findings does not apply with the same force when "First Amendment rights are at stake." *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 841, 98 S.Ct. 1535, 1542, 56 L.Ed.2d 1 (1978). It is equally significant for a second reason—Article XXVIII is a ballot initiative and thus was subjected to neither extensive hearings nor considered legislative analysis before passage. *Cf. United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. at 565–567, 93 S.Ct. at 2890–91 (noting the extensive legislative findings that supported the Hatch Act).

In plain fact, Arizonans for Official English offer us nothing more than "assertion and conjecture to supports its claim" that Article XXVIII's restrictions on speech would serve the alleged state interests. *Landmark,* 435 U.S. at 841, 98 S.Ct. at 1542. However, we need not decide whether the absence of a factual record is fatal to that claim. For even if we assume the article does serve the alleged ends, we could not hold that the benefits to be obtained outweigh the burdens imposed on First Amendment rights.

In evaluating the justifications advanced by the amendment's sponsor, we are guided by two Supreme Court cases from the 1920s in which nearly identical justifications were asserted in support of laws restricting language rights. *See Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Farrington v. Tokushige,* 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646 (1927). *Meyer* involved a Nebraska statute that prohibited the teaching of non-English languages to children under the eighth grade level; *Tokushige,* similarly, involved a Hawaii statute

---

**24.** The dissenters concluded that it is wholly irrelevant whether the restrictions at issue are justified on the basis of the "employer" interests of efficiency and effectiveness, or broader interests. *See id.* at 100 & n. 3, 110 S.Ct. at 2751 n.

**3.** In their view, there is "no reason in policy or principle" why the government should not be free to further even its broader interests through appropriate restrictions on employee speech. *Id.*

that singled out "foreign language schools," such as those in which Japanese was taught, for stringent government control.

In defending the statute at issue in *Meyer*, the state of Nebraska explained that "[t]he object of the legislation ... [is] to create an enlightened American citizenship in sympathy with the principles and ideals of this country." 262 U.S. at 393, 43 S.Ct. at 625; *see also id.* at 398, 43 S.Ct. at 626 (asserting that purpose of law was to prevent children from having "inculcate[d] in them the ideas and sentiments foreign to the best interests of this country"); *id.* at 390, 43 S.Ct. at 625 (noting that law was designed "to promote civic development," and inhibit the acquisition of "foreign ... ideals"). More recently, the Court explicitly characterized the language restriction in *Meyer* as designed "to promote civic cohesiveness by encouraging the learning of English." *Epperson v. Arkansas,* 393 U.S. 97, 105, 89 S.Ct. 266, 271, 21 L.Ed.2d 228 (1968). Despite these worthy goals, the Court ruled that the repressive means adopted to further them were "arbitrary" and invalid. *Meyer,* 262 U.S. at 403, 43 S.Ct. at 628.

Similarly, the provision at issue in *Tokushige* had the specific purpose of regulating language instruction "in order that the Americanism of the students may be promoted." 273 U.S. at 293, 47 S.Ct. at 407. As in *Meyer,* the *Tokushige* Court recognized the validity of the interests asserted in defense of the statute. 273 U.S. at 299, 47 S.Ct. at 409. Nonetheless, citing *Meyer*'s invalidation of the Nebraska law, it found that the statute's promotion of these interests was insufficient to justify infringing on the constitutionally protected right to educate one's children to become proficient in one's mother tongue.[25]

*Meyer* and *Tokushige* also demonstrate the weakness of the second justification for Article XXVIII proffered by Arizonans for Official English: that of encouraging a common language. In *Meyer,* the statute reflected the belief that "the English language should be and become the mother tongue of all children reared in this state." 262 U.S. at 398, 43 S.Ct. at 626. The statute in *Tokushige* would have similarly inhibited the spread of the Japanese language, presumably in favor of English. 273 U.S. at 298, 47 S.Ct. at 408. Although there is probably no more effective way of encouraging the uniform use of English than to ensure that children grow up speaking it,[26] both statutes were struck down on the ground that these interests were insufficient to warrant such restrictions on the use of foreign languages.

Like the Court in *Meyer* and *Tokushige,* we recognize the importance of (1) promoting democracy and national unity and (2) encouraging a common language as a means of encouraging such unity. *See Guadalupe Organization, Inc., supra.* The two primary justifications relied on by the article's proponents are indeed closely linked. We cannot agree, however, that Article XXVIII is in any way a fair, effective, or appropriate means of promoting those interests, or that even under

**25.** The fact that the Supreme Court, deciding these cases in the 1920s, struck down the language restrictions in *Meyer* and *Tokushige* as violative of due process does not lessen their relevance. Substantive due process was the doctrine of choice for the protection of fundamental rights during the first part of this century, although it has now largely been replaced by other constitutional doctrines. *See, e.g., Halter v. Nebraska,* 205 U.S. 34, 42, 27 S.Ct. 419, 422, 51 L.Ed. 696 (1907) (similarly framing free speech claim in terms of property rights). It should therefore be clear that the Court's formal labeling of the right as falling under the rubric of substantive due process does not control our consideration of it—and, in fact, the Court subsequently explicitly recharacterized *Meyer* as protecting First Amendment freedoms. *See Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965); *see also Epperson,* 393 U.S. at 105–06, 89 S.Ct. at 270–71

(First Amendment case considering *Meyer* as relevant but noting that it "was decided before the Court expressly applied the specific prohibitions of the First Amendment to the States"); Yassky, *Eras of the First Amendment,* 91 Col.L.Rev. 1699, 1733 (1991) (describing *Meyer* as First Amendment case); Tribe, American Constitutional Law 1319–20 (2d ed. 1988) (noting that Justice McReynolds wrote *Meyer* "[u]sing the tools of his time," but that it has been reinterpreted as embodying First Amendment principles).

**26.** The dissent in *Bartels v. Iowa,* 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923), which applied equally to *Meyer,* strongly emphasized this point. 262 U.S. at 412, 43 S.Ct. at 630. The majority, however, remained unpersuaded that these concerns outweighed the fundamental rights at issue.

a more deferential analysis its severely flawed effort to advance those goals outweighs its substantial adverse effect on first amendment rights. As we have learned time and again in our history, the state cannot achieve unity by prescribing orthodoxy. *See West Virginia Bd. of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Meyer,* 262 U.S. 390, 392, 43 S.Ct. 625, 625 (argument of plaintiff) (forced "Americanization" violates American tradition of liberty and toleration). Notwithstanding this lesson, the provision at issue here "promotes" English only by means of proscribing other languages and is, thus, wholly coercive. Moreover, the goals of protecting democracy and encouraging unity and stability are at most indirectly related to the repressive means selected to achieve them. Next, the measure inhibits rather than advance's the state's interest in the efficient and effective performance of its duties. Finally, the direct effect of the provision is not only to restrict the rights of all state and local government servants in Arizona, but also to severely impair the free speech interests of a portion of the populace they serve.

We should add that we are entirely unmoved by the third justification—that allowing government employees to speak languages other than English when serving the public would undermine public confidence and lead to "disillusionment and concern." To begin with, it is clear that the non-English speaking public of Arizona would feel even greater disillusionment and concern if their communications with public employees and, effectively, their access to many government services, were to be barred by Article XXVII. Moreover, numerous cases support the notion that the interest in avoiding public hostility does not justify infringements upon constitutional rights. *See, e.g., Buchanan v. Warley,* 245 U.S. 60, 81, 38 S.Ct. 16, 20, 62 L.Ed. 149 (1917) (possibility of race conflict does not justify housing segregation); *Palmore v. Sidoti,* 466 U.S. 429, 433–34, 104 S.Ct. 1879, 1882–83, 80 L.Ed.2d 421 (1984) (society's racial animus not legitimate factor to consider in awarding custody of child). In short, the "concern" that some members of the Arizona public may feel over the use of non-English languages provides no basis for prohibiting their use no matter the degree of scrutiny we apply.

Thus, under a balancing test, whether identified as a *Waters/Pickering* type of test or a test modelled after that standard, as employed by the dissenters in *Rutan,* Article XXVIII must be held unconstitutional. *A fortiori,* the article cannot survive a traditional strict scrutiny test. We reach our conclusions only after giving full consideration to the governmental interest in controlling the content and manner of the speech of its employees in the performance of their work assignments. Here, however, that interest, when balanced against the considerations we have examined, cannot outweigh the free speech interests impaired by Article XXVIII.

### E.

#### Conclusion

To conclude, Article XXVIII is not a valid regulation of the speech of public employees and is unconstitutionally overbroad. By prohibiting public employees from using non-English languages in performing their duties, the article unduly burdens their speech rights as well as the speech interests of a portion of the populace they serve. The article similarly burdens the First Amendment rights of state and local officials and officers in the executive, legislative, and judicial branches.

We note that the adverse impact of Article XXVIII's overbreadth is especially egregious because it is not uniformly spread over the population, but falls almost entirely upon Hispanics and other national origin minorities. *Cf. Spun Steak,* 998 F.2d at 1486 (English-only rule in the workplace may disproportionately affect Hispanic employees); *see generally N.A.A.C.P. v. City of Richmond,* 743 F.2d 1346, 1356 (9th Cir.1984) (holding, in case involving restriction on NAACP march against racist police practices, that courts "must examine restrictions on speech with particular care when their effects fall unevenly on different . . . groups in society"); Tribe, *supra,* at 979. Since language is a close and meaningful proxy for national ori-

gin,[27] restrictions on the use of languages may mask discrimination against specific national origin groups or, more generally, conceal nativist sentiment. *See, e.g., Yu Cong Eng v. Trinidad,* 271 U.S. 500, 528, 46 S.Ct. 619, 627, 70 L.Ed. 1059 (1926) (statute prohibiting keeping of account books in any language other than English or Spanish denies equal protection of law to Chinese merchants); *Lau v. Nichols,* 414 U.S. 563, 566–69, 94 S.Ct. 786, 788–90, 39 L.Ed.2d 1 (1974) (recognizing right under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, of non-English-speaking Chinese students to receive bilingual compensatory education, because "students who do not understand English are effectively foreclosed from any meaningful education"); *Asian American Business Group v. City of Pomona,* 716 F.Supp. 1328, 1332 (C.D.Cal.1989) (law restricting use of non-English alphabetical characters discriminates on basis of national origin); *Hernandez v. Erlenbusch,* 368 F.Supp. 752, 755–56 (D.Or.1973) (tavern's English-only rule constitutes illegal discrimination against Mexican American patrons); Califa, *Declaring English the Official Language: Prejudice Spoken Here,* 24 Harv. C.R.–C.L.L.Rev. 293, 325, 328 n. 225 (1989); Note, *A Trait–Based Approach to National Origin Claims Under Title VII,* 94 Yale L.J. 1164, 1165 & n. 5 (1985). In light of these considerations, the equal protection ramifications of Article XXVIII's restrictive impact strongly support our holding, as well.[28]

As President Franklin D. Roosevelt once remarked, "all of our people all over the country, all except the pure-blooded Indians, are immigrants or descendants of immigrants, including those who came over on the Mayflower." N.Y. Times, Nov. 5, 1944, at 38. Many and perhaps most immigrants arrived in the United States speaking a language other than English. Nonetheless, this country has historically prided itself on welcoming immigrants with a spirit of tolerance and freedom—and it is this spirit, embodied in the Constitution, which, when it flags on occasion, courts must be vigilant to protect.

In closing, we note that tolerance of difference—whether difference in language, religion, or culture more generally—does not ultimately exact a cost. To the contrary, the diverse and multicultural character of our society is widely recognized as being among our greatest strengths. Recognizing this, we have not, except for rare repressive statutes such as those struck down in *Meyer, Bartels, Yu Cong Eng,* and *Farrington,* tried to compel immigrants to give up their native language; instead, we have encouraged them to learn English. The Arizona restriction on language provides no encouragement, however, only compulsion: as such, it is unconstitutional.

---

27. *Cf. Hernandez v. New York,* 500 U.S. 352, 371, 111 S.Ct. 1859, 1872–73, 114 L.Ed.2d 395 (1991) (noting that in some contexts proficiency in particular languages might be "treated as a surrogate for race"); *but cf. Carmona v. Sheffield,* 475 F.2d 738, 739 (9th Cir.1973); *Soberal–Perez v. Heckler,* 717 F.2d 36, 41 (2d Cir.1983), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984).

28. We note, once again, a strong similarity between this case and *Meyer.* Because the invalidated Nebraska statute to a large extent targeted the substantial German–American community in that state (and was enacted in the wake of World War I), *Meyer* has been viewed as a precursor to modern equal protection doctrine. Tribe, *supra,* at 1320 n. 13; *Hernandez,* 500 U.S. at 371, 111 S.Ct. at 1873. This reading of *Meyer* is strengthened by the fact that one of the laws struck down in *Bartels v. Iowa,* 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923), its companion case, specifically singled out the German language for repression. *See Bartels,* 262 U.S. at 410 n. 2, 43 S.Ct. at 629 n. 2 (statute allowed teaching of non-English languages as elementary school subjects, "provided that the German language shall not be taught"). Even Justice Holmes, who otherwise dissented from the majority opinion, agreed that that statute was unconstitutional. *Bartels,* 262 U.S. at 413, 43 S.Ct. at 630 (Holmes, J., dissenting).

The speech of unpopular groups, of course, often meets with hostility and repression, though it is more commonly the message that is targeted than the language in which it is communicated. Given the link between unpopular speech and unpopular groups, it is not surprising that even some of our most venerable First Amendment precedents have an (albeit implicit) equal protection component. *See, e.g., Barnette, supra* (Jehovah's Witnesses); *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (black civil rights activists).

## IV.

### Nominal Damages

Finally, we must consider the question of Yniguez's right to nominal damages. The State of Arizona expressly waived its right to assert the Eleventh Amendment as a defense to the award of nominal damages. In *Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978), the leading case on this issue, the Supreme Court held that plaintiffs in a § 1983 action were entitled to nominal damages for ·the deprivation of their due process rights even without proof of actual injury. The Court explained that:

> [c]ommon-law courts traditionally have vindicated deprivations of certain absolute rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed.

*Id.; see also Lokey v. Richardson,* 600 F.2d 1265, 1266 (9th Cir.1979), *cert. denied,* 449 U.S. 884, 101 S.Ct. 238, 66 L.Ed.2d 110 (1980).

■■■ The right of free speech, like that of due process of law, must be vigorously defended. Indeed, the protection of First Amendment rights is central to guaranteeing society's capacity for democratic self-government. *See* Meiklejohn, Free Speech and Its Relation to Self–Government (1948); *New York Times v. Sullivan,* 376 U.S. 254, 269–70, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964). Thus, even without proof of actual injury, Yniguez is entitled to nominal damages for prevailing in an action under 42 U.S.C. § 1983 for the deprivation of First Amendment rights. *See Nakao v. Rushen,* 635 F.Supp. 1362, 1364 n. 5 (N.D.Cal.1986).[29]

**29.** Indeed, an award of nominal damages in recognition of society's interest in vindicating the disputed right is singularly appropriate in First Amendment overbreadth cases such as this, for a successful plaintiff in an overbreadth case has

## V.

### Conclusion

We affirm the district court's judgment that Article XXVIII of the Arizona Constitution is facially overbroad and violates the First Amendment, and that the article is unconstitutional in its entirety. We reverse and remand the district court judgment insofar as it denies Yniguez an award of nominal damages.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

### APPENDIX

ARTICLE XXVIII. ENGLISH AS THE OFFICIAL LANGUAGE

1. *English as the Official Language; Applicability.*

Section 1. (1) The English language is the official language of the State of Arizona.

(2) As the official language of this State, the English language is the language of the ballot, the public schools and all government functions and actions.

(3)(a) This Article applies to:

(i) the legislative, executive and judicial branches of government,

(ii) all political subdivisions, departments, agencies, organizations, and instrumentalities of this State, including local governments and municipalities,

(iii) all statutes, ordinances, rules, orders, programs and policies,

(iv) all government officials and employees during the performance of government business.

(b) As used in this Article, the phrase "This state and all political subdivisions of this State" shall include every entity, person, action or item described in this Section, as appropriate to the circumstances.

convinced the court to strike down a law that would, if left standing, chill the constitutionally protected speech of large numbers of other members of society.

**2. *Requiring This State to Preserve, Protect and Enhance English.***

Section 2. This State and all political subdivisions of this State shall take all reasonable steps to preserve, protect and enhance the role of the English language as the official language of the state of Arizona.

**3. *Prohibiting This State from Using or Requiring the Use of Languages Other Than English; Exceptions.***

Section 3. (1) Except as provided in Subsection (2):

(a) This State and all political subdivisions of this State shall act in English and no other language.

(b) No entity to which this Article applies shall make or enforce a law, order, decree or policy which requires the use of a language other than English.

(c) No governmental document shall be valid, effective or enforceable unless it is in the English language.

(2) This State and all political subdivisions of this State may act in a language other than English under any of the following circumstances:

(a) to assist students who are not proficient in the English language, to the extent necessary to comply with federal law, by giving educational instruction in a language other than English to provide as rapid as possible a transition to English.

(b) to comply with other federal laws.

(c) to teach a student a foreign language as a part of a required or voluntary educational curriculum.

(d) to protect public health or safety.

(e) to protect the rights of criminal defendants or victims of crime.

**4. *Enforcement; Standing.***

Section 4. A person who resides in or does business in this State shall have standing to bring suit to enforce this Article in a court of record of the State. The Legislature may enact reasonable limitations on the time and manner of bringing suit under this subsection.