Dean COHEN, Plaintiff,

v.

SAN BERNARDINO VALLEY COLLEGE et al., Defendants.

No. CV–94–1083–RSWL–GHKx.

United States District Court, C.D. California.

April 14, 1995.

Rohde & Victoroff, Stephen F. Rohde and John W. Howard, Individual Rights Foundation, Los Angeles, CA, for plaintiff.

Phillip L. Kossy, Littler Mendelson Fastiff Tichy & Mathiason, San Diego, CA, and Amy Greyson, Brunick Alvarez & Battersby, San Bernardino, CA, for defendants.

## OPINION

LEW, District Judge.

Pursuant to Fed.R.Civ.P. 65(a), the parties in this case have stipulated to a bench trial in this matter based solely on a stipulated record and written briefs. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

 Plaintiff Dean Cohen ("Cohen") brings a 42 U.S.C. § 1983 action for violation of his First Amendment rights. He asks the Court to grant injunctive relief against various officials of San Bernardino Valley College (Defendants are hereinafter collectively referred to as "the College"). This action presents the question of whether a state college may limit the classroom speech of its professors in order to prevent the creation of a hostile, sexually discriminatory environment for its students. The Court hereby rules that a state college may do so, if the limitations involved are reasonable and nar-

rowly tailored to achieve the college's mission of effectively educating its students. Plaintiff therefore receives no relief in this action.

## I.  *Facts* [1]

The following facts are uncontroverted. Cohen is a tenured professor who has taught English and Film Studies at San Bernardino Valley College ("SBVC") since 1968. In the spring of 1992, Cohen taught a remedial English class (English 015) to community college students. Students are required to take English 015 as a prerequisite to other college-level English classes such as English 101. This matter arises out of discipline imposed on Cohen for his teaching in a 015 class in the spring semester of 1992.

By his own admission, Cohen uses a confrontational teaching style designed to shock his students and make them think and write about controversial subjects. He assigns provocative essays such as Jonathan Swift's "A Modest Proposal" and discusses subjects such as obscenity, cannibalism, and consensual sex with children.[2] At times, Cohen uses vulgarities and profanity in the classroom.

One of the students in the spring semester English 015 class, Anita Murillo, became offended by Cohen's repeated focus on topics of a sexual nature, his use of profanity and vulgarities, and by his comments which she believed were directed intentionally at her and some other female students in a humiliating and harassing manner. In February of 1992, Cohen began a class discussion in his English 015 class on the issue of pornography and played the "devil's advocate" by asserting controversial viewpoints. During classroom discussion on this subject, Cohen stated in class that he wrote for Hustler and Playboy, and he read some articles out loud in class.[3] Cohen concluded the class discussion by requiring his students to write essays defining pornography. When Cohen assigned the "Define Pornography" paper, Murillo asked for an alternative assignment but Cohen refused to give her one.

According to Murillo, Professor Cohen then told her that if she met him in a bar he would help her get a better grade. She also claimed that Cohen would look down her shirt, as well as the shirts of other female students, and that he told her she was overreacting because she was a woman.

Murillo stopped attending Cohen's class and received a failing grade for the semester. She subsequently complained about Cohen's statements and conduct to the chair of the English Department, asserting that Cohen had sexually harassed her. Murillo then filed a formal written student grievance against Cohen on May 12, 1993.

On May 26, 1993, the SBVC Faculty Grievance Committee held a hearing to determine whether Murillo's complaint was well-founded. Both Cohen and Murillo testified, submitted documents, and called witnesses on their own behalf. At the conclusion of the hearing, the Grievance Committee found that Professor Cohen had violated the Community College District's policy against sexual harassment by creating a hostile learning environment.[4] The Grievance Committee

---

1. The parties have stipulated that the record consists of evidence previously submitted on Plaintiff's motion for preliminary injunction and Defendants' motion for summary judgment.

2. It appears that the consensual sex with children topic is not discussed in his English 015 classes.

3. The record is unclear as to what articles were read in Murillo's class. Students from other classes testified that Cohen distributed, as mandatory reading on the pornography topic, an article he had written entitled "The Film Critic and Pornography." Ex. 17 at 403, 409. Cohen's article discusses the definition of a "four-handkerchief movie" (i.e., a pornographic film which is extremely arousing to the male viewer) and

contains the line "I had an erection in about eight seconds." Ex. 18 at 205. This article was discussed in those classes.

4. The San Bernardino Valley Community College District prohibits sexual harassment by employees. It defines sexual harassment as

> unwelcome sexual advances, requests for sexual favors, and other verbal, written, or physical conduct of a sexual nature. It includes, but is not limited to circumstances in which: ... (2) Such conduct has the purpose or effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive learning environment.

SBVC Student Sexual Harassment Plan, Policy 6130.

then recommended certain disciplinary action to the President of the District.

The President of the District then issued a ruling which found Cohen in violation of the District's policy against sexual harassment. Among other things, the President found that Cohen engaged in "sexual harassment which had the effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile or offensive work environment." In addition, the President found that Cohen made "sexually suggestive" remarks to Murillo and that several students were offended by Professor Cohen's use of profanity and frequent use of sexual topics in class.

Both Cohen and Murillo appealed the President and Grievance Committee's decision to the San Bernardino Community College Board of Trustees ("Board") which considered the matter at hearings on October 15, 1993 and November 11, 1993. Cohen and Murillo were represented by attorneys and each of them testified on their own behalf. In addition, students came forward to testify about the sexual nature of Cohen's teaching material and his frequent use of derogatory language, sexual innuendo, and profanity.

On November 17, 1993, the Board found that Cohen engaged in sexual harassment which unreasonably interfered with an individual's academic performance and created an intimidating, hostile, or offensive learning environment. The Board then ordered Cohen to:

1. Provide a syllabus concerning his teaching style, purpose, content, and method to his students at the beginning of class and to the department chair by certain deadlines;

2. Attend a sexual harassment seminar within ninety days;

3. Undergo a formal evaluation procedure in accordance with the collective bargaining agreement; and

4. Become sensitive to the particular needs and backgrounds of his students, and to modify his teaching strategy when it becomes apparent that his techniques create a climate which impedes the students' ability to learn.

Thereafter, on February 18, 1994, Cohen filed a suit under 42 U.S.C. § 1983 against the San Bernardino Valley College Board of Trustees, the Chancellor of SBVC, the President of SBVC, various SBVC department heads, and members of the Faculty Grievance Committee. The complaint sought a declaratory judgment, a preliminary and permanent injunction, damages, and attorneys' fees. On April 4, 1994, this Court denied Cohen's motion for a preliminary injunction, on the grounds that Cohen failed to show a likelihood of success on the merits. On July 18, 1994 this Court also dismissed entity defendants San Bernardino Valley College, the Board of Trustees of San Bernardino Community College District, and the Faculty Grievance Committee, on the grounds that the entity defendants enjoy Eleventh Amendment immunity and are not considered "persons" under 42 U.S.C. § 1983.[5] On October 31, 1994, the Court ruled that the individual defendants are entitled to qualified immunity from damages under § 1983.

## II. The SBVC Policy As Applied to Cohen Does Not Violate the First Amendment

The heart of this suit is Cohen's assertion that the College's sexual harassment policy violates the First Amendment to the United States Constitution and Article I, § 2(a) of the California Constitution.[6] Co-

---

Under this policy, forms of sexual harassment "include but are not limited to.... (v)erbal harassment—[d]erogatory comments, jokes or slurs." *Id.*

5. Defendants argue that this Court cannot grant Cohen's request for injunctive relief because (1) in their individual capacities, none of the remaining Defendants have the power to carry out the requested relief; and (2) in their official capacities, the members of the Grievance Committee do not have the power to carry out the requested relief. Defendants' arguments are not persua-

sive. *Savarese v. Agriss*, 883 F.2d 1194, 1209 (3d Cir.1989).

6. Cohen does not separately argue his state law claim but states in his Opening Trial Brief that references to the First Amendment should be taken to include the California Constitution as well.

Art. I., § 2(a) of the California Constitution provides that

Every person may freely speak, write and publish his or her sentiments on all subjects, being

hen's position implicates the current debate concerning the need to make workplaces and schools places of inclusion, and the need to preserve individual liberties.[7]

## A. Academic Freedom Doctrine

Cohen argues that his right to "academic freedom" prevents the College from punishing him for his classroom speech. In support of his argument, Cohen cites numerous cases. The concept of academic freedom, however, is more clearly established in academic literature than it is in the courts. *See generally* Symposium, *Academic Freedom in a Changing Society*, 66 Texas L.Rev. 1247 (1988). As one commentator has written,

> The First Amendment protects academic freedom. This simple proposition stands explicit or implicit in numerous judicial opinions, often proclaimed in fervid rhetoric. Attempts to understand the scope and foundation of a constitutional guarantee of academic freedom, however, generally result in paradox or confusion. The cases, shorn of panegyrics, are inconclusive, the promise of their rhetoric reproached by the ambiguous realities of academic life.

> The problems are fundamental: There has been no adequate analysis of what academic freedom the Constitution protects or of why it protects it. Lacking definition or guiding principle, the doctrine floats in the law, picking up decisions as a hull does barnacles.

J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment"*, 99 Yale L.J. 251, 252–53 (1989).

Several courts have noted that judicial application of this doctrine is far from clear. *Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547, 552–53 (5th Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *Mahoney v. Hankin*, 593 F.Supp. 1171, 1174 (S.D.N.Y.1984) (stating that the parameters of academic freedom "are not well-defined, especially with regard to a teacher's speech within the [college] classroom").

■■■ While Supreme Court cases contain strongly worded defenses of "academic freedom," their rhetoric is broader than their holdings. Namely, many cases restrict the government from regulating teachers' *nonclassroom* conduct. For example, teachers like other government employees cannot be punished or excluded under unconstitutional statutes requiring them to take "loyalty oaths" or otherwise disclose their allegiance to "subversive" groups. *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). Nor may teachers be punished under unconstitutionally vague statutes forbidding "treasonable" or "seditious" words or actions. *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). The state is also precluded from punishing a teacher for publicly expressing his views on matters of public concern in regards to education. *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (holding unconstitutional a school board's firing of a high school teacher for writing a letter to a local newspaper criticizing the school board); *see* discussion § II B. *infra.*

Most of the appellate cases cited by Cohen deal, like *Pickering*, with non-classroom conduct. *Powell v. Gallentine*, 992 F.2d 1088 (10th Cir.1993) (holding professor's revelation of grade fraud protected as a matter of public concern); *Levin v. Harleston*, 966 F.2d 85, 88–89 (2d Cir.1992) (finding that professor could not be penalized for *nonclassroom*, controversial writings); *Greminger v. Seaborne*, 584 F.2d 275, 277 (8th Cir. 1978) (finding that public comment on edu-

---

responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.

. The California Constitution more broadly protects the right to expression than does the First Amendment. *Robins v. Pruneyard Shopping Ctr.*, 23 Cal.3d 899, 907, 153 Cal.Rptr. 854, 859, 592 P.2d 341, 346 (1979), *aff'd*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). However,

Cohen cites no cases, and there appear to be no cases under the state constitution which protect Cohen's speech in this context.

**7.** *See* Eugene Volokh, Comment, *Freedom of Speech and Workplace Harassment*, 39 U.C.L.A. L.Rev. 1791 (1992); *see, e.g.*, Asra Q. Nomani, *Was Prof's Lecture Academic Freedom Or Sex Harassment?*, Wall St.J., March 7, 1995, at A1.

cational funding and salaries was protected by the First Amendment). Other cited cases do not rest on First Amendment grounds. *See, e.g., Mailloux v. Kiley,* 448 F.2d 1242, 1243 (1st Cir.1971) (per curiam) (affirming on Due Process grounds judgment for high school teacher who used an obscenity in English class).

Cohen cites only two Supreme Court cases which deal with regulation of teachers' *classroom* conduct, and these cases are based on the Establishment Clause, not on freedom of expression. *Edwards v. Aguillard,* 482 U.S. 578, 596–97, 107 S.Ct. 2573, 2584, 96 L.Ed.2d 510 (1987) (striking down state law requiring teachers who taught "evolution-science" to also teach "creation-science," on the grounds that the law endorsed religion in violation of the First Amendment); *Epperson v. Arkansas,* 393 U.S. 97, 103–04, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (striking down state law prohibiting teaching of evolution, on the grounds that the government should be "neutral" in regards to religious tenets).

In further support of his "academic freedom" argument, Cohen cites cases dealing with the constitutional rights of *students* within the school environment. *Healy v. James,* 408 U.S. 169, 187–88, 92 S.Ct. 2338–49, 33 L.Ed.2d 266 (1972) (upholding associational right of college students forming a SDS chapter to be formally recognized by the university and be accorded the same access to campus facilities as other college clubs); *Tinker v. Des Moines Sch. Dist.,* 393 U.S. 503, 505–06, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (upholding freedom to expression right of high school students to wear black armbands to school, in protest of the Vietnam War). Again, these cases do not directly control the facts of this case.

■ Moreover, recent Supreme Court cases have narrowed the scope previously accorded to students' exercise of their constitutional rights within the high school setting. In *Hazelwood Sch. Dist. v. Kuhlmeier,* the Court allowed a high school principal to cen-

sor the school newspaper, because the censorship "reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988). In so ruling, the Supreme Court stated that, while students do not shed their rights at the schoolhouse door, students' freedom of expression is " 'not automatically coextensive with the rights of adults in other settings.' " *Hazelwood,* 484 U.S. at 267, 108 S.Ct. at 567 (quoting *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986)). This was a restriction of *Tinker,* which primarily focused on whether the expression at issue presented the possibility of materially and substantially disrupting the educational process. *Tinker,* 393 U.S. at 512–13, 89 S.Ct. at 740. The *Hazelwood* Court stressed that high schools are allowed broad control over their curriculum. *Hazelwood,* 484 U.S. at 271, 108 S.Ct. at 570. In *Bethel,* the Court likewise found that high schools could restrict speech which undermined the school's "basic educational mission." 478 U.S. at 686, 106 S.Ct. at 3165. In that case, the high school punished a student for giving a speech full of sexual innuendo at a school-sponsored assembly. *Id.* at 675, 106 S.Ct. at 3160. The *Bethel* Court found this punishment permissible, in light of the school's interest in "teaching students the boundaries of socially appropriate behavior." *Id.* at 681, 106 S.Ct. at 3163.[8]

A number of circuits have found similar broad university control over curriculum. The First Circuit has held that a university has substantial control over such core university concerns as "course content, homework load, and grading policy." *Lovelace v. Southeastern Massachusetts University,* 793 F.2d 419, 424 (1st Cir.1986). The *Lovelace* court held that a university may decline to renew a nontenured teacher's employment on the grounds that his grading policy failed to comply with university standards. *Id.* In so holding, the *Lovelace* court refused to find that the teacher's grading policy was constitutionally protected, stating that "[t]he first

---

**8.** The Court notes that cases dealing with high school students may not fully apply in the college or university context. As the Ninth Circuit has written, "[d]ifferent considerations govern application of the first amendment on the college

campus and at lower level educational institutions." *Nicholson v. Board of Educ.,* 682 F.2d 858, 863 n. 4 (9th Cir.1982). Nonetheless, many of the First Amendment concerns remain the same, regardless of the education level.

amendment does not require that each non-tenured professor be made a sovereign unto himself." *Id.*

Other courts have likewise found substantial university control over grading policies and teaching methods. *Peloza v. Capistrano Unified School Dist.*, 782 F.Supp. 1412, 1416 (C.D.Cal.1992) (holding that a high school biology teacher has no "constitutional right to conduct himself as a loose cannon in his classroom ... and teach scientific theories of his own choosing"), *aff'd in part and rev'd in part on other grounds*, 37 F.3d 517 (9th Cir.1994); *Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547, 552 (5th Cir.) (holding nontenured teacher could be terminated for refusing to give an unearned grade to a student), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *Hetrick v. Martin*, 480 F.2d 705, 708–09 (6th Cir.) (upholding university's decision to decline to renew a nontenured teacher because of her pedagogical methods; the pedagogical methods at issue included stating, in the classroom, "I am an unwed mother"), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973); *Clark v. Holmes*, 474 F.2d 928, 931–32 (7th Cir.1972) (upholding university's decision to decline to renew a nontenured teacher because of the teacher's refusal to conform to university-required course content and teaching approach), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973).

Other courts, however, have placed limits on the state's control of classroom discussion. *Keefe v. Geanakos*, 418 F.2d 359, 362 (1st Cir.1969) (finding that a high school teacher's classroom use of an obscenity for demonstrated educational purpose was protected); *Dube v. State Univ.*, 900 F.2d 587, 598 (2d Cir.1990) (denying qualified immunity to defendants on the grounds that a professor's classroom discussion of controversial topics was protected by the First Amendment), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991); *Parducci v. Rutland*, 316 F.Supp. 352, 356 (M.D.Ala.1970) (holding that a high school English teacher could not be penalized for assigning a Kurt Vonnegut short story which was not inappropriate or disruptive).

■ Thus, a review of the case law shows that, despite eloquent rhetoric on "academic freedom," the courts have declined to cede all classroom control to teachers. The parameters of academic freedom are not distinct, particularly in relation to the potential conflict with a university's duty to ensure adequate education of its students. What is clear, however, is that invocation of the "academic freedom" doctrine does not adequately address the complex issues presented by this case. For that reason, this Court declines to hold that SBVC's discipline of Cohen is precluded by general notions of academic freedom under the First Amendment.

## B. The Government as Employer Cases

Because the doctrine of academic freedom does not clearly protect Cohen's classroom, curriculum-based speech, the Court now turns to the line of cases dealing with the government's ability to regulate its employees' speech. The Supreme Court has acknowledged the conflict inherent in public employers' restriction of employee speech. In *Connick v. Myers*, the Supreme Court confirmed the government's right as an employer to restrict employee speech, unless that speech pertains to matters of "public concern." 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)), as the root of this doctrine). *Connick* discussed the discharge of a Louisiana assistant district attorney. The assistant district attorney was terminated for her workplace distribution of a "questionnaire" on office policies and morale which essentially asked for a "vote of no-confidence" in office supervisors. She argued that, inasmuch as the questionnaire dealt with the workings of a governmental agency, it was speech on a matter of public concern and therefore protected. The *Connick* Court disagreed, finding that the survey was designed to support the assistant district attorney's own personal battle with her superiors over a proposed transfer, not to objectively evaluate or comment on the workings of the district attorneys' office. 461 U.S. at 147–48, 103 S.Ct. at 1690.

■ Under *Connick*, this Court must first determine whether Cohen's speech can be characterized as "constituting speech on a matter of public concern." 461 U.S. at 146, 103 S.Ct. at 1690. If it can be so characterized, then the Defendants must show that the speech "substantially interfered" with government duties. 461 U.S. at 149–50, 103 S.Ct. at 1691. If it is not speech on a matter of public concern, then the government is entitled to "wide latitude in managing [its employees], without intrusive oversight by the judiciary in the name of the First Amendment," and this Court may not interfere in such managerial decisionmaking. 461 U.S. at 146, 103 S.Ct. at 1690.

■ *Waters v. Churchill* further elaborated on this approach to governmental restriction of employees' speech. —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). In that case, a nurse employed at a state-run hospital was terminated for criticizing departmental policies to a potential department employee. *Id.* In ruling that the termination did not violate the nurse's First Amendment rights, Justice O'Connor wrote for the four-Justice plurality:

> To be protected, the [government employee's] speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to " 'the interest of the State, as an employer in promoting the efficiency of the public services it performs through its employees.' "

*Id.* at ——, 114 S.Ct. at 1884 (quoting *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687). *Waters* expressly states that "constitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign." *Id.* at ——, 114 S.Ct. at 1887. The government as employer has far broader powers to restrict its employees' speech than does the government as sovereign. *Id.* at ——, 114 S.Ct. at 1886. This broad power is based on the government's interest in efficiently carrying out its mission. *Id.* at —— – ——, 114 S.Ct. at 1887–88.

The Supreme Court recently affirmed this approach in *United States v. National Trea-sury Employees Union*, when it struck down a federal law prohibiting federal executive branch employees from receiving compensation for speeches or articles. —— U.S. ——, ——, 115 S.Ct. 1003, 1008, 130 L.Ed.2d 964 (1995). In so holding, the Court found that the prohibited speech involved matters of public concern. *Id.* at ——, 115 S.Ct. at 1013. The Court further found that the government's argument that regulation was necessary to prevent workplace disruption was speculative and did not justify the burden imposed on expressive activities. *Id.* at ——, 115 S.Ct. at 1015.

The *Connick* approach has been applied within an educational context. The *Pickering* Court acknowledged that,

> it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. The Ninth Circuit has previously employed a *Pickering* balancing-type test to a high-school journalism teacher's freedom of expression rights. *Nicholson v. Board of Educ.*, 682 F.2d 858, 865 (9th Cir.1982). In *Nicholson*, a journalism teacher was terminated after, contrary to the principal's instructions, he encouraged the publication of controversial articles in the high school paper and failed to submit sensitive articles to school administrators before publication. *Id.* The *Nicholson* court found that the school had an interest in school discipline, loyalty, and harmony among co-workers, and that therefore, the teacher's termination did not violate the First Amendment. *Id.*

In this case, the record is undisputed as to what speech is at issue. This speech falls into two categories: (1) Cohen's use of vulgarities and obscenities in the classroom; and (2) Cohen's curricular focus on sexual

topics such as pornography, as well as his classroom comments on sexual subjects.

### 1. *Speech on a Matter of Public Concern*

■ Cohen's profanity is not speech on a matter of public concern. *Yniguez v. Arizonans for Official English*, 42 F.3d 1217, 1235 n. 20 (9th Cir.1994) (*citing Waters*) (dictum) ("[T]he government would have an indisputable right to prohibit its employees from using profanity or abusive language...."); *see Waters*, —— U.S. at ——, 114 S.Ct. at 1886 ("[W]e have never expressed doubt that a government employer may bar its employees from using Mr. Cohen's offensive utterance to members of the public, or to the people with whom they work."). The Fifth Circuit has squarely held that a college instructor's habitual classroom use of profanity is not speech on a matter of public concern. *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986); *see Dambrot v. Central Michigan Univ.*, 839 F.Supp. 477, 488 (E.D.Mich.1993) (finding that university basketball coach's use of a racial epithet during team pep-talk was not speech on a matter of public concern). Thus, Cohen's use of profanity is not protected speech under *Connick*, and it may be regulated by the College.

However, it is less clear whether Cohen's comments on pornography and other sexual topics constitute speech on a matter of public concern. The determination of whether an employee's speech is a matter of public concern is often a difficult one, for which there are few bright-line tests. *See generally* Stephen Allred, *From Connick to Confusion: The Struggle to Define Speech on Matters of Public Concern*, 64 Ind.L.J. 43 (1988); D. Gordon Smith, Comment, *Beyond "Public Concern": New Free Speech Standards for Public Employees*, 57 U.Chi.L.Rev. 249 (1990).

■ A public employee's speech is constitutionally protected if it may be fairly considered to relate to "any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690. In determining whether an employee's speech addresses a matter of public concern, the Court must look at the "'content, form, and context of a given statement, as revealed by the whole record.'" *Rankin v. McPher-*

*son*, 483 U.S. 378, 384–85, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987) (quoting *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690) (finding a state employee's comment on the attempted assassination of President Ronald Reagan that she hoped the next attempt would succeed was speech on a matter of public concern). This determination is made as a matter of law. *Allen v. Scribner*, 812 F.2d 426, 430 n. 8 (9th Cir.), *amended*, 828 F.2d 1445 (9th Cir.1987). Content is the most important factor in this analysis. *Johnson v. Multnomah County*, 48 F.3d 420, 424–25 (9th Cir. Feb. 16, 1995). Moreover, "[t]he inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387, 107 S.Ct. at 2898.

Many cases address this "matter of public concern" issue within the context of an employee's criticism of government conduct. In *Gillette v. Delmore*, the Ninth Circuit found that a fireman's criticism of fire department action, during the action in question, involved a matter of public concern. 886 F.2d 1194, 1197 (9th Cir.1989). The *Gillette* Court wrote that the fireman's speech "concerned the manner in which police and fire fighters performed their duties on a particular occasion," and thus was entitled to constitutional protection. *Id.* at 1197; *see Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir.1992) (holding that juvenile hall volunteer could not be penalized for sending memorandum critical of juvenile hall management to judges and the governing agencies), *cert. denied*, —— U.S. ——, 113 S.Ct. 2337, 124 L.Ed.2d 248 (1993); *Burgess v. Pierce County*, 918 F.2d 104, 106 (9th Cir.1990) (per curiam) (holding that fire marshall's opposition to county ordinance was protected speech on a matter of public concern); *Allen v. Scribner*, 812 F.2d 426, 431 (9th Cir.), *amended*, 828 F.2d 1445 (9th Cir.1987) (holding that state entomologist's public criticism of state's medfly infestation project was speech on a matter of public concern).

In those cases, the courts focused on determining whether the statements at issue were protected speech on government conduct or unprotected speech dealing with the

"minutiae of workplace grievances." *See Johnson v. Multnomah County,* 48 F.3d at 425 (finding that county employee's criticism of her supervisor as part of the "good old boy network" involved in misconduct and mismanagement was speech on a matter of public concern, even though there was evidence that the employee was personally "embittered"); *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983) (holding that police officer's public criticism of police pay rate was speech on a matter of public concern because "[s]peech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies"). The court of appeals has held that "[o]ne critical inquiry is whether the employee spoke in order to bring wrongdoing to light or merely to further some purely private interest." *Havekost v. U.S. Dep't of Navy,* 925 F.2d 316, 318 (9th Cir.1991) (holding that grocery bagger's circulation of petition calling for discharge of head grocery bagger was not speech on a matter of public concern).

While these government criticism cases constitute the scenario most often considered under *Connick,* numerous cases have applied *Connick* where, as here, the speech at issue was unrelated to government conduct. These cases, for example, have dealt with comments about political figures as in *Rankin* and with speaking Spanish on the job as in *Yniguez.* The Fifth Circuit has held that a high school teacher's supplemental reading list was not speech on a matter of public concern. *Kirkland v. Northside Ind. Sch. Dist.,* 890 F.2d 794, 802 (5th Cir.1989), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990). Further, a firefighter's reading of Playboy Magazine during his off-duty hours at the firehouse has been found to be protected expression related to matters of public concern because the magazine included articles "relating to politics, sports, arts and entertainment." *Johnson v. County of Los Angeles Fire Dep't,* 865 F.Supp. 1430, 1436 (C.D.Cal.1994).

Based on this case law, the Court finds that the pornography topic and the other sexually-oriented topics discussed in Cohen's classes are matters of concern to the community and thus are topics of public concern. The Court further finds that the record shows that the content and form of Cohen's statements addressed these topics. Thus, Cohen's commentary on those topics is commentary on a matter of public concern. Therefore, the first prong of the *Connick* test for protected government employee speech is satisfied. The Court must now address the balancing prong of the *Connick* test.

### 2. *Balancing Test*

Because Cohen's speech in assigning sexually focused topics and his commentary on those topics relates to a matter of public concern, the burden shifts to Defendants to show that their legitimate interests outweigh Cohen's First Amendment interests. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899; *Johnson v. Multnomah County,* 48 F.3d at 421–22. In applying this balancing test, the Court must consider the manner, time, place, and context of the employee's expression. *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899. The state's burden in justifying the regulation varies according to the nature of the employee's expression. *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691–92. Other pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899 (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 570–73, 88 S.Ct. 1731, 1735–37, 20 L.Ed.2d 811 (1968)). Essentially, the state's interest is based on "the effective functioning of the public employer's enterprise." 483 U.S. at 388, 107 S.Ct. at 2899.

The Court must consider the employer's interest in effectively functioning, and whether that effective function is disrupted. *Thomas v. Carpenter,* 881 F.2d 828, 830–31 (9th Cir.1989) (holding that sheriff's

deputy could not be penalized for statements made during an election in which he challenged the incumbent sheriff), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1475, 108 L.Ed.2d 612 (1990). In so determining the government's interest, the Court should consider whether the statement at issue impairs discipline, co-worker relations, or impedes the performance of the speaker's duties or the operation of the enterprise. *Id.* at 831. If the speech at issue directly deals with issues of public concern, a stronger showing of disruption is required. *Id.* (citing *McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir. 1983)). The context of the situation determines how strong a showing must be made. *Id.* A showing of real, not imagined disruption, is required. *McKinley*, 705 F.2d at 1115.

In *I.N.S. v. Federal Labor Relations Auth.*, the Ninth Circuit held that the First Amendment interests of an I.N.S. agent in wearing a pro-union button on his uniform while he was on duty were outweighed by the agency's efficient functioning interest in presenting an easily recognizable image to the public and fostering *esprit de corps*. 855 F.2d 1454, 1466 (9th Cir.1988). In so holding, the court noted that the regulation at issue was not directed at a particular viewpoint or even at expression per se. *Id.* Pre–*Connick*, the Ninth Circuit declined to apply *Pickering*'s protection of public employee speech to police officers publicly critical of police department tactics, stating that "[s]ubstantial differences between the public interest in education and the public interest in safety and order justify a difference in the standards by which the respective institutions may protect themselves from attempted destruction by their employees." *Byrd v. Gain*, 558 F.2d 553, 554 (9th Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). *Byrd*'s distinction between teachers and police officers has been cited by subsequent Ninth Circuit cases as highlighting the need to consider the context of the statement when applying the second prong of the *Connick–Waters* test. *Thomas*, 881 F.2d at 831; *Allen*, 812 F.2d at 432.

In *Wheaton v. Webb–Petett*, the court of appeals upheld the termination of a manage-rial state employee who, during informational meetings, made remarks "unsupportive" of a new state program to employees responsible for implementing that program. 931 F.2d 613, 618 (9th Cir.1991). The *Wheaton* court found that, although the manager had a strong interest as a citizen in dissenting as to the new program, that interest was outweighed by the risk that his reiterated objections would endanger the implementation of the new program. *Id.* In line with that reasoning, the court of appeals has similarly held that an employee's comments on the government's behalf may be restricted by the government. *Kotwica v. City of Tucson*, 801 F.2d 1182, 1184–85 (9th Cir.1986) (holding that government spokesperson's comments to media on proposed city program, when she had been expressly instructed not to comment on the program, were not protected because of the government's interest in the accurate announcement of its policy).

The Ninth Circuit recently applied the *Waters–Connick* balancing test to an Arizona law prohibiting state employees from speaking languages other than English on the job. *Yniguez v. Arizonans for Official English*, 42 F.3d 1217, 1234–35 (9th Cir.1994). In applying the balancing test, the court of appeals found that the state law was unconstitutional, because there was no evidence that the state's interest in efficiency was served by the language prohibition. *Id.* at 1239. The Ninth Circuit did not directly address the question of whether speaking a language other than English actually qualifies as speech on a matter of public concern but merely noted that the fact that the speech occurred as part of the performance of official duties did not dictate a result. *Id.* at 1235.

The College brings forth substantial, uncontroverted evidence showing that the educational process was disrupted by Cohen's focus on sexual topics and teaching style. There is testimony from the complaining student and from other students in the class that Cohen's sexually suggestive remarks, use of vulgarities and obscenities, and the topics for discussion prevented them from learning.

Furthermore, written evaluations of Cohen by his colleagues done in November of 1992,

before Murillo filed her grievance against Cohen, show that while his colleagues respected Cohen as a teacher, several of them entertained doubts as to the efficacy of his confrontational teaching methods. According to one peer evaluator who observed a class in which Cohen discussed and assigned a paper on the topic of consensual sex with children, Cohen's

> specific focus impedes academic success for some students ... I question whether or not many of our students have the academic preparation and/or emotional maturity (stability) to cope with the nature of Mr. Cohen's assignments.

Opp. to Mot. Prelim. Inj., Bundy Decl., Ex. 14 at 363.

Another observer stated that Cohen's approach to the topic of "the pros or the cons of consensual sex with children" did not foster unfettered discussion by students but instead "require[d] self-censorship rather than complex analysis of an important issue." Opp. to Mot. Prelim. Inj., Bundy Decl., Ex. 14 at 361. The evaluator further wrote that,

> [c]ertainly the issue of what in this society is considered to be sexual abuse deserves discussion. But given the student population, it deserves sensitive, complex discussion—not the reductionist approach that Mr. Cohen's assignment requires. Rather than fostering free inquiry, Mr. Cohen's assignment as stated undermines the crucial nature of the issue.

Opp. to Mot. Prelim. Inj., Bundy Decl., Ex. 14 at 361.

Lastly, Cohen himself concedes that his teaching methods do not work with every student. He has stated that he deliberately uses an "abrasive" teaching style to elicit a response from his students. He admitted during the hearing before the Board that, while his style was effective as to some students, it was not as to others: "[T]here's always a sort of ratio between success and failure. Techniques work with one student and not another...." Opp. to Mot. Prelim. Inj., Bundy Decl., Ex. 17 at 447 (11/11/93 Hearing Tr. at 46). Moreover, in answer to a question as to whether he considered himself an excellent teacher, Cohen replied, "That would depend on the student. A teacher is good with one student and not so good with another, and that has something to do with the student's perception of the teacher. One cannot be all things to all students." Opp. to Mot. Prelim. Inj., Bundy Decl., Ex. 17 at 453 (11/11/93 Hearing Tr. at 52).

In fairness, the Court must note that there is evidence in the record that Cohen's teaching style is effective for at least some students. Cohen's colleagues have stated that he is a gifted and enthusiastic teacher. Furthermore, according to the chair of the English Department (who is a defendant in this action), Cohen's teaching style is within the range of acceptable academic practice. The record also contains statements from several students to the effect that Cohen's challenging classroom style contributed to their learning experience. Moreover, the record contains positive student evaluations of Cohen submitted by English 101 and English 015 classes for the Fall 1992 and Fall 1993 semesters. However, this evidence does not controvert the evidence showing that the learning process for a number of students was hampered by the hostile learning environment created by Cohen.

In applying a "hostile environment" prohibition, there is the danger that the most sensitive and the most easily offended students will be given veto power over class content and methodology. Good teaching should challenge students and at times may intimidate students or make them uncomfortable. In a different context, the Supreme Court has previously refused to ban all material which offends the sensibilities of society's most sensitive and vulnerable members. *Butler v. Michigan*, 352 U.S. 380, 383–84, 77 S.Ct. 524, 525–26, 1 L.Ed.2d 412 (1957) (holding that a state statute prohibiting all distribution of written material harmful to minors was "burn[ing] the house to roast the pig" because it "reduce[d] the adult population of Michigan to reading only what is fit for children"). Colleges and universities, as well as the courts, must avoid a tyranny of mediocrity, in which all discourse is made bland enough to suit the tastes of all students.

However, colleges and universities must have the power to require professors to ef-

fectively educate all segments of the student population, including those students unused to the rough and tumble of intellectual discussion. If colleges and universities lack this power, each classroom becomes a separate fiefdom in which the educational process is subject to professorial whim. Universities must be able to ensure that the more vulnerable as well as the more sophisticated students receive a suitable education. The Supreme Court has clearly stated that the public employer must be able to achieve its mission and avoid disruption of the workplace. Within the educational context, the university's mission is to effectively educate students, keeping in mind students' varying backgrounds and sensitivities. Furthermore, the university has the right to preclude disruption of this educational mission through the creation of a hostile learning environment. As the *Yniguez* court noted, public employers must have the authority to determine what tasks its employees perform. *Yniguez,* 42 F.3d at 1235 n. 20.

■■ The restrictions imposed by Defendants are not onerous. The College has required Cohen to issue a syllabus at the beginning of each semester for each of his classes. Cohen must attend a sexual harassment seminar. Cohen must be formally evaluated, and he is directed to "be sensitive" to students. These restrictions are tailored and reasonable, in light of the issues involved. The College is not directly censoring Cohen's choice of topics or teaching style. In essence, the College is requiring Cohen to warn students of his teaching style and topics so that those students for whom this approach is ineffective may make an informed choice as to their educations.[10]

■■ Thus, even though Cohen's speech on the topic of pornography was speech on a matter of public interest, the College's interest in effectively educating its students outweighs Cohen's interest in focussing on sexual topics in the classroom, to the extent that the university only requires Cohen to warn potential students of his teaching style and topics.

As an alternative basis for its ruling, the Court recognizes the constitutional implications of the College's substantial interest in preventing the creation of a hostile, sexually discriminatory environment which would disrupt the educational process. The Supreme Court has found that creating a "hostile environment" based on gender is a form of sexual harassment which violates Title VII. *Harris v. Forklift Sys., Inc.,* —— U.S. ——, ———— ——, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986).[9] Several circuits, including the Ninth Circuit, have held that sexual harassment is a type of sexual discrimination which violates the Equal Protection Clause of the Fourteenth Amendment. *Bator v. Hawaii,* 39 F.3d 1021, 1027 (9th Cir.1994) (holding that a claim of sexual harassment "can be impermissible sex discrimination in violation of the Equal Protection Clause"); *Bohen v. City of East Chicago,* 799 F.2d 1180, 1185 (7th Cir.1986) ("Sexual harassment of female employees by a state employer constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment."); *Starrett v. Wadley,* 876 F.2d 808, 814–15 (10th Cir.1989) (holding that terminated state employee plaintiff had a 42 U.S.C. § 1983 cause of action for supervisor's propositions, physical contact, and quid pro quo threats).[10]

9. Cohen argues that the fact the complaining party in this case is a student, rather than an employee, makes these cases inapposite. However, it seems clear that the issue in those cases is the status of the harassers—the state employees—not the status of the people harassed. Thus, it is immaterial that the complaining student in this case is not a state employee.

10. The College cites Cal.Educ.Code § 212.6, which requires SBVC, along with other educational institutions, to adopt a written policy against sexual harassment. While this possible conflict in duties makes the College's position

more sympathetic, this statutory duty does not mandate a decision in the College's favor. Thus, the fact that Defendants were statutorily required to implement this sexual harassment policy has little relevance to this Court's determination of the policy's constitutionality under the First Amendment. Likewise irrelevant is the College's citing of Title IX, 20 U.S.C. §§ 1681–1688 (prohibiting sexual harassment in the educational environment) and *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (allowing a high school stu-

### III. *Cohen Received Fair Notice Under the Speech Policy, and the Policy is Not Facially Invalid*

██ Cohen further argues that, under the First Amendment, he is guaranteed "fair notice" of restrictions on protected speech, and that he did not receive such notice. Cohen's argument fails under the *Connick–Waters* line of cases which hold that the government as employer has broader procedural, as well as substantive, power in restricting speech. *Waters,* — U.S. at —, 114 S.Ct. at 1886. For example, a public employer may prohibit its employees from " 'being rude to customers,'" a standard that in another context would be impermissibly vague. *Waters,* — U.S. at — – —, 114 S.Ct. at 1886–87. Thus, even if the sexual harassment policy at issue here would be considered impermissibly vague or overbroad if applied to the public at large, the Court holds that the College as a public employer has greater substantive and procedural power to regulate its employees' speech, and that the policy therefore is not invalid on its face. Moreover, the Court holds that Cohen received fair notice of what speech was prohibited by the policy.

Cohen cites two cases in which public university "hate speech" codes governing *student* speech were struck down as unconstitutionally vague and overbroad. Although the speech codes in those cases regulated student speech, not just the speech of state employees, their language closely parallels the language at issue here. In *Doe v. University of Michigan,* the university restricted speech which, among other things "stigmatizes or victimizes an individual on the basis of race, ethnicity, religion, sex ... and that ... [c]reates an intimidating, hostile, or demeaning environment for educational pursuits...." 721 F.Supp. 852, 856 (E.D.Mich. 1989). The university speech code further banned "sexual advances, requests for sexual favors, and verbal or physical conduct that stigmatizes or victimizes an individual on the basis of sex ... where such behavior ... [c]reates an intimidating, hostile, or demeaning environment for educational pursuits, employment...." *Id.* The district court

struck down these regulations as facially vague and overbroad, and as applied. *Id.* at 864–67.

The *UWM Post, Inc. v. Board of Regents* court similarly struck down as vague and overbroad University of Wisconsin regulations prohibiting

> racist or discriminatory comments, epithets or other express behavior directed at an individual ... if such comments ... intentionally: ... [c]reate an intimidating, hostile, or demeaning environment for education....

774 F.Supp. 1163, 1178, 1180 (E.D.Wis.1991); *see Dambrot v. Central Michigan Univ.,* 839 F.Supp. 477 (E.D.Mich.1993) (striking down hate speech code as facially invalid, even though not unconstitutional as applied to university coach under *Connick* ).

However, the speech codes at issue in the above cases all restricted student speech, not merely employee speech as here. The SBVC anti-sexual harassment policy, which restricts only employee speech, is accorded procedural leeway under *Connick* and is not unconstitutional. This case may thus be distinguished from *Doe v. University of Michigan* and *UWM Post, Inc. v. Board of Regents.*

### IV. *Conclusion*

The Court thus holds that, under *Connick* and *Waters,* the College has the authority to require Cohen to distribute a syllabus detailing his controversial teaching style, attend an anti-sexual harassment seminar, and to submit to a formal evaluation of his teaching methods. The College is entitled to issue these narrowly tailored requirements because it has shown that its educational mission has been disrupted for some students by Cohen's teaching style. The College's substantial interest in educating all students, not just the thick-skinned ones, warrants the College's requiring Cohen to put potential students on notice of his teaching methods. The College's interest in fulfilling its educational mission is further bolstered by the constitutional implications of sexual harassment.

dent to maintain a damages claim against her

school for a violation of Title IX).

In so holding, the Court notes that this ruling goes only to the narrow and reasonable discipline which the College seeks to impose. A case in which a professor is terminated or directly censored presents a far different balancing question. Further, the Court notes that the College must avoid restricting creative and engaging teaching, even if some over-sensitive students object to it.

Judgment is hereby rendered in Defendants' favor on all of Plaintiff's First Amendment and Cal. Const. art. I., § 2(a) claims.

**IT IS SO ORDERED.**